William A. Miller, Bar #011622
WILLIAM A. MILLER, PLLC
8170 North 86th Street, Suite 208
Scottsdale, Arizona  85258
Telephone: (602) 319-6899
bmiller@williamamillerpllc.com

Attorneys for Plaintiff Dr. Seyed Mohsen
Sharifi Takieh

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

SEYED MOHSEN SHARIFI TAKIEH, an individual,

Plaintiff,

v.

BANNER HEALTH, an Arizona not-for-profit corporation; MICHAEL O'MEARA, M.D. and JANE DOE O'MEARA, husband and wife; JANICE COHEN DINNER and DEAN M. DINNER, wife and husband; STEPHEN HU, M.D. and JANE DOE HU, husband and wife; STEVEN MAXFIELD, M.D. and JANE DOE MAXFIELD, husband and wife; JAMES LYONS, M.D. and JANE DOE LYONS, husband and wife; MICHAEL O'CONNOR, M.D. and JANE DOE O'CONNOR, husband and wife; PETER FINE and REBECCA AILES-FINE, husband and wife; CHRISTOPHER VOLK and JANE DOE VOLK, husband and wife,

Defendants.

NO.

**PLAINTIFF'S COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

**AND**

**DEMAND FOR JURY TRIAL**

Plaintiff Seyed Mohsen Sharifi Takieh (hereinafter "Dr. Sharifi"), alleges claims against Defendants as follows:

**JURISDICTION AND VENUE**

1.     This is a case brought under federal statute 42 U.S.C. § 1981 and federal question jurisdiction exists under 28 U.S.C. § 1331.

2.     Venue for this case is properly vested in the District Court of Arizona located in Maricopa County. The Parties reside in this District, as defined in 28 U.S.C. § 1391. And the disputes complained of herein occurred in Maricopa County, Arizona.

**PARTIES**

3.     Plaintiff Seyed Mohsen Sharifi Takieh, M.D. ("Dr. Sharifi") is a citizen of Arizona who resides in Maricopa County. Dr. Sharifi has been licensed to practice medicine for twenty-eight years. He is Board Certified in Vascular Medicine, Interventional Cardiology, Cardiovascular Medicine, and Nuclear Cardiology.

4.     Defendant Banner Health (Banner) is an Arizona not-for-profit corporation and healthcare system.  Banner operates several hospitals in Arizona under various trade names, including Banner Baywood Medical Center (BBMC).

5.     Dr. Sharifi is a member of the Medical Staff with clinical privileges at seven hospitals in Arizona, including BBMC.  In addition to BBMC, Dr. Sharifi has clinical privileges at three other Banner hospitals, including Banner Heart Hospital (BHH), Banner Gateway Medical Center (BGMC), and three non-Banner hospitals.

6.     Defendant Michael O'Meara, M.D. (O'Meara) is a citizen of Arizona who resides in Maricopa County.  O'Meara is a senior physician who was formerly affiliated with Tri-City Cardiology Consultants, P.C.  (Tri-City).  Tri-City is the largest cardiology provider at BBMC and BHH.  At all relevant times to this action, O'Meara was the acting President of Medical Staff at BBMC.

7.     It is unknown whether or not O'Meara is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community

and his spouse, Defendant Jane Doe O'Meara, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

8.   Defendant Janice Cohen Dinner ("Dinner") is a citizen of Arizona who resides in Maricopa County.  At all times relevant to this action, Dinner was Senior Associate General Counsel for Banner.  Dinner was married during the times alleged herein, and she committed the acts and omissions set forth and participated in the transactions set forth herein for her own benefit and for the benefit of the marital community and her spouse, Defendant Dean M. Dinner, who upon information and belief is also a citizen and resident of Maricopa County, Arizona.

9.   Defendant Stephen Hu, M.D. (Hu) is a citizen of Arizona who resides in Maricopa County.

10.   It is unknown whether or not Hu is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Jane Doe Hu, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

11.   Defendant Steven Maxfield, M.D. (Maxfield) is a citizen of Arizona who resides in Maricopa County.

12.   It is unknown whether or not Maxfield is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Jane Doe Maxfield, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

3

13.     Defendant James Lyons, M.D. (Lyons) is a citizen of Arizona who resides in Maricopa County.  At all times relevant to this action, Lyons was Co-Executive Vice President of Southwest Diagnostic Imaging (SDI).

14.     It is unknown whether or not Lyons is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Jane Doe Lyons, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

15.     Defendant Michael O'Connor, M.D. (O'Connor) is a citizen of Arizona who resides in Maricopa County.  At all times relevant to this action, O'Connor was the Chief Medical Officer at BBMC.

16.     It is unknown whether or not O'Connor is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Jane Doe O'Connor, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

17.     Defendant Peter Fine (Fine) is a citizen of Arizona who resides in Maricopa County.  At all times relevant to this action, Fine was the Chief Executive Officer of Banner Health.  Fine was married during the times alleged herein, and he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Rebecca Ailes-Fine, who upon information and belief is also a citizen and resident of Maricopa County, Arizona.

18.     Defendant Christopher Volk (Volk) is a citizen of Arizona who resides in Maricopa County.   At all times relevant to this action, Volk was a member of the Board of Directors for Defendant Banner.

19.     It is unknown whether or not Volk is now, or was married during the times alleged herein, but if so, he committed the acts and omissions set forth and participated in the transactions set forth herein for his own benefit and for the benefit of the marital community and his spouse, Defendant Jane Doe Volk, who upon information and belief is also a citizen and resident of Maricopa County, Arizona, and whose real name when made known to Plaintiff will be substituted by amendment to this Complaint.

## NATURE OF THE CASE

20.     This is a racial discrimination case involving physicians practicing in highly specialized and competitive fields of medicine.

21.     Some of the facts of this case sound so shocking to the modern conscience, and run so contrary to our belief that no American should be denied the benefits of their skill, education, training, and hard work on account of race, that it may be tempting to discount them.

22.     Other facts in this case clash with another firmly held notion: that doctors – especially ones in positions of authority – simply do not act as Defendants did.

23.     There is no explanation, and certainly no excuse for the blatant racism that motivated Defendants' actions, but Defendants believed that they could avoid both the discovery and the consequences of their actions because of Arizona's peer review and confidentiality statutes as contained in A.R.S. §§ A.R.S. §36-445, et. seq. and/or A.R.S. §36-2403.

24.     Defendants were so secure in the cloak of immunity and veil of secrecy with which Arizona's statutory scheme imbued them that they eventually began to openly discussing the details of their conspiracy to rid the Banner system of Dr. Sharifi by any means.

25.     Sworn statements from witnesses who overheard some of Defendants' conversations eventually confirmed what Dr. Sharifi knew all along – that Defendants were out to get him, and it had nothing to do with his ability to practice medicine.

26.     These same witnesses swore that they heard certain Defendants admit to the elaborate lengths the group had gone in furtherance of the plot, including manufacturing phony charges, spreading lies and other false innuendo's throughout the Banner system of hospitals, falsifying evidence, and even rewriting reports of their hand-picked expert when his opinions did not support the manufactured charges against Dr. Sharifi.

27.     Dr. Sharifi wanted to believe that Defendants' actions were attributable to the fact that the healthcare professionals who were in charge of the local Banner hospitals where he practiced were more interested in market share than patient health, but he had suspected another more sinister motive – that he was an Iranian Muslim.

28.     Witnesses have confirmed that on the direct orders of Fine and Volk to "get rid of Dr. Sharifi at all costs," whether he had done anything to deserve it or not, Dinner, the self-proclaimed "puppeteer" of the acts described below, personally vowed to make the "idiot Muslim Iranian's life a living hell."

29.     A witness also overheard O'Meara – who was in charge of all the bogus investigations predetermined to result in his termination – refer to Dr. Sharifi as a "f…ing Iranian" who was stealing Banner's referrals, but who should instead be hiding under a rock like the rest of his kind.

30.     In another instance, a witness heard Hu, Maxfield, and Lyons admit that there was indeed a coordinated plan to rid the Banner system of Dr. Sharifi – referred to as the "f…ing Iranian" who had the nerve to take away their DVT practice – and the participants would go to any lengths (and already had) to make their phony accusations against Dr. Sharifi stick.

31.     Maxfield reminded the others that he had been trying to get rid of Dr. Sharifi since 2009, but now, with the guaranteed immunity and confidentiality of the peer review statutes,

the Banner administration's encouragement and full support, along with the concerted efforts of the other Defendants, the "f…cking Iranian" would finally be gone.

## **BACKGROUND**

32.     Dr. Sharifi is a Muslim American of Iranian descent.

33.     Until recently, Dr. Sharifi was also a credentialed cardiovascular physician at four separate Banner Health medical facilities.

34.     Dr. Sharifi is one of the foremost experts in the treatment of venous thrombolytic disease ("VTE"), Pulmonary Embolism (PE), and Percutaneous Endovenous Intervention (PEVI), such as venous stents, IVC filters, and catheter-directed thrombolysis.

35.     Dr. Sharifi has impeccable credentials; the respect of his peers and other experts in his field; a large and increasing network of referrals from other physicians who recognize the results he achieves with his novel treatment modalities; as well as an unblemished medical record after nearly thirty years of practicing medicine.

36.     Defendants – who are all members of the medical staff, Banner administration, and/or physicians competing with Dr. Sharifi in his practice area – have long exhibited animosity toward Dr. Sharifi, as well as resistance towards his treatment methods.

37.     While Dr. Sharifi often suspected that defendants were biased or prejudiced against him on the basis of his race, he placated himself with the notion that their hostility was the result of professional jealously since Dr. Sharifi receives the vast majority of referrals for the treatment of VTE in the Banner system, and is asked to speak or write on the subject so frequently that he cannot accept all the invitations.

38.     Larry Spratling, former Chief Medical Officer at Banner during much of Dr. Sharifi's tenure, understood that Dr. Sharifi's advanced and interventional approach to DVT/PE ran counter to back dated approaches used at BBMC, but this approach was the cutting-edge in the field.

39.     In some instances, the treatments Dr. Sharifi (and other pioneers in the field) had proven to be effective are, in the minds of Defendants and other physicians counter-intuitive, and consequently clashed with their outdated medical practice.

40.     One mistake that Spratling made, is believing that Defendants and Dr. Sharifi's other detractors – as physicians – were scientists, and as such could be convinced of the superiority of new methods by research and demonstrated results in patients.

41.     Spratling was aware that some of the physicians in the Banner system resisted Dr. Sharifi and his new methods, however, he believed that educating these physicians with the latest findings, including the research being conducted by Dr. Sharifi, was the best response to such ignorance.

42.     In and around 2009, while Maxfield was the head of the Interventional Radiology (IR) department at Banner, he referred nearly every one of Dr. Sharifi's cases to peer review, looking for some excuse to restrict or terminate Dr. Sharifi's privileges.

43.     When Dr. Sharifi told Spratling about Maxfield's conduct, Spratling suspected that Maxfield's criticism was racially motivated, but he advised Dr. Sharifi to write Maxfield and explain that he was abusing the peer review process because of his personal dislike of Dr. Sharifi.

44.     Dr. Sharifi wrote the letter Spratling recommended, and for a good while, the unwarranted peer review stopped, although Dr. Sharifi – like all Banner physicians – still occasionally underwent peer review when it was justified.

45.     Dr. Sharifi actively, and willingly participated in these peer reviews, although none of his peer reviewed cases found quality of care issues with medical treatment.

46.     Eight years later, Defendants used the Maxfield letter, along with a few other letters  written in reaction to a bogus sexual harassment investigation in 2015, to support the termination of his privileges, and even justification for restrictions that essentially eliminated his ability to defend himself against their unjustified charges.

47.     While Spratling was CMO until sometime in late 2014, he provided a level of protection to Dr. Sharifi from physicians who opposed him and his treatments.

48.     Spratling regularly invited Dr. Sharifi to give presentations on his research and the exciting new developments in the treatment of VTE / PE to the Banner physicians and staff, but Spratling left his position as CMO of BBMC to assume other positions with Banner in late 2014.

49.     Then in 2012, Dr. Sharifi was involved in the treatment of a patient at BGMC, C. F., who – after surgery performed by another Banner physician – developed a life threatening blood clot.

50.     In an effort to remove blood clots from C. F.'s inferior vena cava, Dr. Sharifi ordered low dose thrombolytics to prevent imminent death, but the lytic therapy was improperly and outrageously prevented – initially by a nurse – and then by BGMC CMO David Edwards, M.D. and the surgeon who had performed C. F.'s initial surgery, all with no knowledge of the field and of the severity and danger posed by the blood clot.

51.     Within hours, C. F. developed a large pulmonary embolism and died because of the failure to permit the administration of the low dose thrombolytics ordered by Dr. Sharifi.

52.     C. F.'s death was caused Dr. Edward's ignorance (as well as the others involved) of recent advances and other discoveries in catheter-directed thrombolysis, and would have been entirely avoided had the thrombolysis been administered.

53.     Dr. Edwards later recused himself as the chair of the Medical Executive Committee (MEC) responsible for peer review performed on C. F.'s case because of the obvious perception of bias.

54.     Nevertheless, Dr. Edwards discounted (and continues to discount) Dr. Sharifi's reliance on his own research – which in some instances may be the ONLY practical research available – as well as articles Dr. Sharifi had written for peer-reviewed journals that supported his treatment in C. F.'s case.

55.     Dr. Sharifi was cleared of any quality of care issues in the peer review of C. F.'s case, but this did not prevent Defendants from using the case against him – five years later and in violation of the Bylaws.

56.     The use of a five year old case from another hospital that resolved in favor of the physician had never been used to support a later termination or restriction of privileges at BBMC before Dr. Sharifi.

57.     In November of 2014, after being named as a potential non-party at fault in a wrongful death action arising from Banner's treatment of C. F., Dr. Sharifi was deposed and testified consistently with the truth as described above.

58.     Within a year after Dr. Sharifi's deposition, Defendants planned and initiated a plot to permanently rid Banner of Dr. Sharifi, as well as to ruin his character, and if necessary, even his medical career.

59.     Defendants were assisted in their plan by knowledge that as long as every action taken or decision made was couched under the guise of "peer review" or "concerns for patient safety," their actions would be immune from any legal recourse, and their plan, including its true motives, could be concealed by the generous privileges of immunity and confidentiality granted by A.R.S. §36-441, et seq.

60.     Under the guise of quality of care concerns, Defendants launched a series of investigations each one designed, and manipulated to achieve the pre-determined result – Dr. Sharifi's termination.

61.     There was no justification for any of the accusations – some of which were bizarre, and so inconsistent with Dr. Sharifi's character that they were unbelievable – were not generated through the peer review process.

62.     There was no pattern or history of medical incompetence or anything else in Dr. Sharifi's career at Banner that would justify the procedures Defendants relied on to avoid the peer review process

63.     One of the two (later changed to three) cases Defendants used to accuse Dr. Sharifi had been peer reviewed at the time of the medical treatment and cleared him, and the other two cases had never even triggered peer review.

64.     Throughout the duration of these "investigations," Defendants spread lies and misinformation about Dr. Sharifi impugning his competence and even accusing him of "killing his patients."

65.     Defendants persisted relentlessly in untenable medical positions, and ignored the excellent patient outcomes Dr. Sharifi had obtained, and simply invented quality of care concerns.

66.     Defendants focused on vague or highly subjective concerns such as "patient selection," or "clinical decision-making," or even "unnecessary risk taking."

67.     Defendants even tried to assail Dr. Sharifi on "poor record keeping," until he demonstrated – in many instances – that he actually did obtain the record he was accused of failing to keep and it was ignored, or – in the case of imaging studies – that it was BBMC that failed to keep proper records.

68.     Defendants' staunchly refused to follow procedures and rights outlined in the Bylaws and other policies, and when confronted, Dinner either supplied interpretations that would permit the violation, or orchestrated changes to the Bylaw's in order to retroactively fix the violation.

69.     Dr. Sharifi has learned that Defendants (among other things): (1) pre-determined the outcome before any investigation of Dr. Sharifi even began (one witness swore that she was told not to refer any patients to Dr. Sharifi before any investigation was initiated because his privileges would be revoked); (2) offered false testimony in the peer review process; (3) withheld key facts from the consideration of the peer review committees; (4) prevented witnesses from testifying in favor of Dr. Sharifi; and, (5) even re-wrote expert reports to match

their accusations (the likely culprit being Dinner since the use of certain terminology was uncharacteristic of a practitioner).

70.     Throughout the duration of Defendant's persecution of Dr. Sharifi one of the lies they effectively spread throughout the Banner network seemed to pacify them whenever conscience pricked – that Dr. Sharifi is a "bad doctor," who "kills patients," or is otherwise "a danger to patients in Arizona."

71.     Defendants have never identified any support for the claim that Dr. Sharifi is incompetent, dangerous, or that he has killed his patients, at the same time they insist on ignoring (and even concealing, or misrepresenting) evidence that proves otherwise.

72.     If Dr. Sharifi really was a terrible doctor who killed his patients and was dangerous to the health of every Arizona resident, then why did Defendants need to resort to the tactics they did?

73.     Defendants lied and misrepresented facts about cases being reviewed, and then threatened or actively prevented Dr. Sharifi from presenting the facts, data, and support for his actions.

74.     Defendants offered false testimony in the hearings, falsified records and other evidence presented, and even changed the Bylaws multiple times – every time in response to an attempt by Dr. Sharifi to exercise a right under the Bylaws then in effect to his detriment.

75.     Defendants extolled the value of the peer review process when applied to Dr. Sharifi, but summarily rejected it when confronted with their own medical ignorance, negligence, or incompetence, and even turned Dr. Sharifi's legitimate concerns about their conduct – like a boomerang – and used it against him.

76.     Quality of care concerns or concerns for patient safety were not the motivations for the actions Defendants took against Dr. Sharifi.

77. Even the best reasons Defendants have offered to explain Dr. Sharifi's termination amounted to nothing more than highly subjective, but meaningless rationalizations like "unprofessional conduct," or "poor judgment," or "clinical decision-making."

78. Claims of patient safety or unnecessary risk were used as a pretext or to otherwise conceal the real reason Defendants went to such extravagant lengths to terminate Dr. Sharifi's medical privileges.

79. To use Dinner's own words – according to a witness who has sworn that she heard her say in reference to Dr. Sharifi, among many other things – the "idiot Muslim Iranian" must be made "an example so nobody dares testify against" Banner.

80. Another witness has sworn that she overhead a conversation between Hu, Maxfield, and Lyons that occurred during what Banner characterized as the "focused investigation" of Dr. Sharifi.

81. Hu was a key witness in the claims against Dr. Sharifi, and he admitted that he was nervous about making false allegations against Dr. Sharifi that "were so ridiculous," he could not believe the Medical Executive Committee (MEC) "bought it."

82. After the trio reassured themselves that such reprehensible conduct was defensible by repeating the mantra "he's a terrible doctor and kills patients," Maxfield and Lyons encouraged Hu not to worry about details like the truth when testifying (because Dinner will cover it all up), but instead to go in there and "F… this F …ing Iranian" who has the nerve to cut into "their DVT practice."

83. In a separate incident, O'Meara was asked by a hospitalist if he should refer a particular complicated venous case to Dr. Sharifi "since it was his specialty," and O'Meara angrily shouted in response "that in this day and age when Muslims are hiding … this f…ing Iranian" has taken all of the referrals on their patients.

84. O'Meara vowed that he, Dinner, and the whole Banner board "will teach him [Dr. Sharifi] a lesson that he won't forget."

13

85.     This is the same O'Meara who was in charge of all the so-called "investigations" of Dr. Sharifi, accusing him of disruptive conduct, bullying, and even at one point ordering him not to provide any exonerating evidence to the MEC members, or risk losing his privileges as a result.

86.     Defendants' racially motivated actions, described in more detail below, have interfered with the contractual relationship between Dr. Sharifi and Banner.

87.     Defendants' racially motivated actions, described in more detail below, have interfered with Dr. Sharifi's ability to receive all of the benefits that naturally flow from his contractual relationship with Banner, including, but not limited to, the referral of patients.

88.     All of Defendants' actions, described in more detail below, were motivated by Dr. Sharifi's race and/or national origin, and if Dr. Sharifi were not a devout Iranian Muslim, Defendants would not have taken these outrageous actions.

89.     Defendants' discrimination against Dr. Sharifi is contrary to the law and is specifically prohibited by 42 U.S.C. § 1981, which ensures that all people, regardless of their race, have the same right to make, enforce, and enjoy the privileges of their contractual relationships.

90.     Through this lawsuit, Dr. Sharifi seeks to vindicate his rights under 42 U.S.C. § 1981.

**FACTS**

91.     Dr. Sharifi came to the United States in 1989 as a visiting student.

92.     He completed his residency in Internal Medicine at Northwestern University Medical School in 1993, and completed his Cardiology Fellowship at The University of Chicago affiliated Lutheran General Hospital.

93.     Dr. Sharifi subsequently enrolled in a year of Interventional Cardiology Fellowship at Indiana University School of Medicine in 1999.

94.     Dr. Sharifi is Board Certified in Vascular Medicine, Interventional Cardiology, Cardiovascular Medicine, and Nuclear Cardiology.  He has maintained a "Faculty"

designation at multiple prestigious institutions, including the American College of Cardiology, Society for Cardiovascular Interventions, Trans Catheter Therapeutics, New Cardiovascular Horizons, and others.

95.     Since Dr. Sharifi graduated from medical school in 1990, he has never had a disciplinary action initiated against him by a medical board in any state where he has been licensed (including Illinois, Wisconsin, Texas, and Indiana).

96.     In nearly three decades of holding medical licenses in six states, Dr. Sharifi's medical record was impeccable.

97.     Dr. Sharifi is an internationally renowned expert in the treatment of venous thromboembolic ("VTE") disease.  He is routinely invited to give lectures at International Meetings as "Faculty" every year.

98.     VTE is an underdiagnosed disease spectrum with a high mortality and morbidity.  Despite significant advances in cardiovascular interventions, venous occlusive disease has not received the attention it deserves from the interventional cardiology community.

99.     Treatments for VTE are right now developing and advancing rapidly, but many of the discoveries made by Dr. Sharifi and other researchers and practitioners may be perceived by non-experts to clash with the conventional use of tPA.

100.    "tPA" is an abbreviation for the term "tissue plasminogen activator" which is a protein involved in the breakdown of blood clots found on endothelial cells, or the cells that line the blood vessels.

101.    Despite what Defendants argue are absolute contra-indications for the use of tPA, recent advancements have proven tPA can be effective in many instances where it would be least expected, such as treating intracranial hemorrhage; tPA may be used intraoperatively to treat acute thrombotic complications; tPA can be employed immediately or shortly after major surgery; and, tPA can even be employed in pregnant patients and during the post-partum period.

102.    The dose, concentration and volume of solvent are key to prevention of complications in the use of tPA.  A blanket designation of "contraindicated" is simplistic, and in every case the risks and benefits must be carefully weighed.

103.    Defendants eventually characterized some of their accusations against Dr. Sharifi "unnecessary risks" to his patients, which being that Dr. Sharifi somehow forced treatment to which the patient did not consent.

104.    Defendants' accusations also implied that they know what is best for the patient, even better than the patient, but in every case used against Dr. Sharifi, he obtained the patients' fully informed written consent.

105.    Dr. Sharifi is routinely invited as an expert lecturer and as faculty to speak at major national meetings on PEVI, venous stents, IVC filters and catheter-directed thrombolysis, of such prestigious organizations as: American College of Cardiology, Society for Coronary Angiography and Interventions, American Heart Association, Society for Vascular Medicine, International Vein Congress, VEITH congress, American College of phlebology, Transcatheter Therapeutics (TCT), International Symposium on Endovascular Therapy (ISET), New Cardiovascular Horizons, Cleveland Clinic's Cardiovascular Innovation, and Chicago Endovascular Conference.

106.    Dr. Sharifi has written extensively on PEVI, contributing material from everything from medical textbook chapters to peer reviewed journals, papers and abstracts.

107.    Dr. Sharifi is the first author on seminal papers concerning PEVI including:

• The TORPEDO Trial -6 months results  on PEVI, venous stents, IVC filters catheter-directed thrombolysis;
• Seminal paper on IVC filters namely Filter PEVI Trial - published in the prestigious European Society of Radiology official Journal namely. It describes technical aspects and role of IVC filters in PEVI;
• Seminal paper on venous stents, where and how to place, technical aspects etc.;
• Seminal paper on Modern Management of  DVT;
• Seminal paper  Thrombus Obliteration by Rapid Percutaneous Endovenous Intervention in Deep Venous Occlusion- midterm results. It reports on PEVI, venous

16

stents, IVC filters catheter- directed thrombolysis;
• Seminal paper on PEVI, venous stents, IVC filters catheter- directed thrombolysis in conjunction with new oral anticoagulants.

108.    Dr. Sharifi is a consultant to the Arizona Medical Board on treatment of endovenous disease, PEVI, venous stents, IVC filters, and catheter- directed thrombolysis.

109.    Dr. Sharifi is the first author on numerous papers; abstracts; and presentations in the field of PEVI, venous stents, IVC filters, catheter- directed thrombolysis.

110.    Dr. Sharifi is invited to write about PEVI, venous stents, IVC filters catheter-directed thrombolysis in peer-reviewed Journals on a routine basis.

111.    Dr. Sharifi has participated as an expert in a Webinar produced by the American Thoracic Society on catheter-directed thrombolysis.

112.    Dr. Sharifi is expert reviewer for the Journals "CHEST," Cochrane Library, Vascular Medicine, and "Catheterization and Cardiovascular Interventions" for topics on PEVI, venous stents, IVC filters, and catheter-directed thrombolysis.

113.    Dr. Sharifi was asked by the Harvard Medical School to furnish its protocol for safe dose thrombolysis which has been adopted.

114.    Dr. Sharifi's reputation and qualifications have led to many referrals from other healthcare providers, such as those at the emergency room at BBMC, and other Banner facilities.

115.    These referrals have formed the main source of his income.

116.    Dr. Sharifi's practice is focused on high-risk patients who also frequently have life-threatening acute problems.

117.    The challenges presented by these patients are exacerbated by the fact that their condition is often changing in such a manner that the same treatment modality may be inappropriate one hour or day, and appropriate, necessary or even essential in the following hours or days.

118.   One thing in particular about Dr. Sharifi's practice that referring physicians have all recognized over the years is the remarkable and sometimes seemingly miraculous patient outcomes.

119.   One interventional cardiologist with almost forty years of practice experience has remarked that Dr. Sharifi's new methods of treatment for patients with severe DVT or PE, are ushering in a new era, and often radically reverse the effects of months or years of degeneration and disease and transform very ill patients in a matter of hours, decreasing morbidity and shortening hospital stays.

120.   Even though Dr. Sharifi treats some of the sickest patients that Banner sees, his patient outcomes, on average, are much better than physicians who do not treat patients with less severe problems.

121.   In nearly three decades of practicing medicine in this specialized high risk field, there have been no actions against Dr. Sharifi by any disciplinary boards, healthcare facilities, or other regulatory agencies.

122.   Since 2005, Dr. Sharifi has maintained active medical staff membership and clinical privileges at the Banner Health network of hospitals, including BBMC, BGMC, and Banner Desert and Banner Heart.

123.   Since 2005, Dr. Sharifi has performed more interventional procedures related to DVT treatment at BBMC's interventional radiology (IR) lab than all of the rest of the practicing radiologists at that facility combined.

124.   At all relevant times, the relationships between Dr. Sharifi and the individual Banner hospitals have been governed by contractual terms contained in the applicable Bylaws, Physician Services Agreements, codes of conduct, and other applicable policies and procedures.

125.   From 2005 and until October 6, 2017, Dr. Sharifi's medical staff membership and clinical privileges at BBMC remained in good standing and had never been terminated, not renewed, or otherwise restricted.

126.   Tri-City was always opposed to Dr. Sharifi's venous interventions at BHH, but did not active take measures to interfere with Dr. Sharifi's privileges.

127.   The physicians at Tri-City eventually realized the value of venous work and started their own vein center namely Tri-City Vein Center.

128.   Prior to the formation of Tri-City Vein Center, Tri-City's motives for opposing Dr. Sharifi were unclear since Tri-City did not perform consults for superficial venous disease, or PEVI.

129.   Tri-City consists of twenty-three cardiologists, including Del Giorno, which have the majority of market share at BBMC and BHH.

130.   O'Meara was formerly affiliated with Tri-City, but is now employed by Banner and serves as president of the medical staff at BBMC.

131.   Tri-City physicians occupy almost all offices related to cardiology, and medicine, including the Medical Executive Committee (MEC).

132.   The MEC positions held by Tri-City physicians are elected positions – not merit based – although the position does require some criteria to be eligible, so the number of Tri-City cardiologists them a distinct advantage in votes.

133.   The same MEC is responsible for peer review, and the investigations of Dr. Sharifi.

134.   Dr. Sharifi's practice always competed with EVDI, and the EVDI physicians always opposed him.

135.   In 2014, EVDI merged with Southwest Diagnostic Imaging (SDI), and as a result became one of the nation's largest private healthcare practices.

136.   Then in 2017, as a result of SDI merger with another gigantic radiology practice, Radiology Partners (RP), RP became the parent company of EVDI.  As a result of this merger RP became the single largest private healthcare practice in the Nation.

137.   Banner then formed a subsidiary called Banner Imaging, to purchase and operate EVDI along with another local radiology practice, Valley Diagnostic Imaging.

138.   EVDI, and Banner Imaging are in direct competition with Dr. Sharifi's practice.

139.   Banner's Interventional Radiology (IR) department has always resisted Dr. Sharifi's practice.

140.   Sometime in 2009, when Dr. Sharifi was initially credentialed at BBMC, Maxfield was the head of IR and constantly submitted Dr. Sharifi's cases to peer review – not because peer review was warranted – but rather in the hope that peer review would find some reason to justify terminating Dr. Sharifi's credentials.

141.   As discussed above, 2009 was during Spratling's tenure as CMO, and he advised Dr. Sharifi to notify Maxfield that his conduct was an abuse of the peer review system.

142.   Maxfield, Hu, and Lyons – all formerly affiliated with EVDI – were upset that Dr. Sharifi was the only practitioner with IR privileges at BBMC who directly competed with them.

143.   In a short period of time, Dr. Sharifi took over the majority of venous interventions superseding all radiologists at BBMC.

144.   As described above, in or around 2008 or 2009, while Chairman of Radiology, Maxfield mischaracterized any differences in Dr. Sharifi's approach to treating VTE patients as a quality of care concern and used them to initiate peer review, but these peer reviews never found any quality of care issues.

145.   As described above, Dr. Sharifi eventually consulted with Spratling who advised him to write a letter, and thereafter, Maxfield tempered his attacks.

146.   Dr. Sharifi was certainly peer reviewed after the incident, but no more frequently than other physicians, so his concerns about Maxfield's racial motivation were temporarily alleviated.

147.   Retaliation for Dr. Sharifi's testimony in the C. F. case, as described above, seemed to provide an additional explanation for some Defendants' overt hostility.

148.   After the incident, Dr. Sharifi reported the conduct of the physicians who halted his treatment through proper peer review channels.

149.   C. F. was a 35 year old woman with a hypercoagulable status, whose disease and PE had progressed in spite of conservative management with conventional anticoagulation, and even an IVC filter, to a point that placed her in imminent risk of death.

150.   Dr. Sharifi, had fully explained the risks of CDT to the patient after bariatric surgery that had occurred approximately two weeks earlier, and obtained informed written consent, so he initiated treatment with PEVI to save her life.

151.   Despite the patient's explicit written consent, initially the supervising RN, and subsequently even Banner officers, out of ignorance, stopped Dr. Sharifi's procedure during the event.

152.   Dr. Sharifi pleaded to anyone he could find while C. F. was still alive to permit the case to go forward, but Banner refused.

153.   Unfortunately C. F. died, but her family, after obtaining outside expert opinion, concluded that Dr. Sharifi's approach was proper approach, and Banner prevented their loved one from receiving this treatment.

154.   C. F.'s family sued Banner and all others physicians involved except Dr. Sharifi, and with his testimony, Banner settled the case for a large, confidential sum.

155.   Peer review BBGC dismissed any allegations of wrong doing against Dr. Sharifi and closed the case in 2012.

156.   O'Meara discovered C. F.'s case in approximately January of 2016, but denied it to the MEC.

157.   In an unprecedented act, O'Meara revived a closed case that had already been resolved in favor of Dr. Sharifi and used it as grounds for terminating his privileges.

158.    Banner has further refused to produce documents showing the BBGC peer review committees' favorable result in order to conceal the facts.

159.    C. F.'s family were so supportive of Dr. Sharifi they came to his Due Process hearing in defense.

160.    Since his testimony coincided with the commencement of Defendants' first unwarranted investigation targeting him, Dr. Sharifi's first reaction was that Defendants' attacks were motivated by the fact that he was a better physician who got most of the patient referrals, or in retaliation for his testimony against Banner.

161.    From the beginning of the so-called investigations, Dr. Sharifi knew there was some motivation driving the Defendants other than those professed because the accusations were both patently false, and Defendants did not follow the processes or procedures that were required in the Bylaws or policies, or – if not specified in those documents – the procedures that were used with others in similar circumstances.

162.    In spite of the criticism and opposition of Defendants and others like them, Dr. Sharifi was still well-liked by many Banner physicians and staff, and had the support of others who believed in his methods.

163.    Defendants knew that Dr. Sharifi would recognize that he was being targeted, and aware that as a result the record concerning their actions might later be subjected to legal challenges or scrutiny.

164.    However, Defendants were also advised and encouraged by Dinner that they were absolutely "untouchable" as a result of the peer review immunity, and that none of their communications or testimony was discoverable in any civil suit.

165.    Less than a year after the C. F. case settled, sometime in 2015, Defendants discovered that Dr. Sharifi had invited nearly 300 medical providers including administrators, physicians, nurses, students, and other persons in the health industry to his office to promote his medical practice.

166.   Some of the individuals had expressed interest in volunteering in Dr. Sharifi's ongoing research.

167.   A few of the individuals were from Banner.

168.   Both men and women were invited, and it was not the type of invitation one would associate with an opportunity to develop relationships that could be characterized as sexual.

169.   Apparently, a nurse complained because she went to Dr. Sharifi's clinic pursuant to one of these invitations expecting to be interviewed for a job, and had paid for child care during that time, but no job interview was presented.

170.   Dinner was able to find a few other instances where Dr. Sharifi's invitations had been misconstrued, and saw this as an opportunity to initiate an investigation of Dr. Sharifi by casting the complaints as sexual harassment.

171.   O'Meara (with Dinner's active assistance) later cast these rather innocent sounding allegations as "luring women to his office with a promise of employment and then attempting to develop a personal relationship with them" and this – according to O'Meara and Dinner – was "sexual harassment."

172.   O'Meara notified Dr. Sharifi by telephone on October 19, 2015, that claims of sexual harassment had been filed against him, and asked him to attend a meeting the following day to discuss the allegations.

173.   On October 20, 2015, Dr. Sharifi met with O'Meara, O'Connor, and two other members of the Medical Staff, who confronted him with accusations they read from a document which Dr. Sharifi was not allowed to examine or copy.

174.   The document had been prepared by Human Resources, not the claimants, and it was littered with factual inaccuracies or misconceptions that were easy to refute.

175.   Dr. Sharifi provided a general explanation about his research and recruitment efforts for various projects, including the voluntary nature of the work and the efforts to invite individuals to see and promote it.

176.   Dr. Sharifi also explained that participants often receive non-monetary benefits such as recognition for their participation and contribution, opportunities to write papers or abstracts, and some participant's papers have been published in journals.

177.   Dr. Sharifi later discovered that the claimants' descriptions of how he presented the research opportunity were similar to his description on October 20, 2015.

178.   From the very beginning of the so-called sexual harassment investigation, Dr. Sharifi knew that the claims were bogus, and most likely framed by Dinner to suggest that his behavior was inappropriate, or even worse.

179.   Dr. Sharifi also expected that the matter would be quickly resolved unless Defendants had manufactured the claims, or had other ulterior motives in pursuing them.

180.   On November 30, 2015, however, O'Meara notified Dr. Sharifi that Human Resources had conducted its investigation of "staff complaints of sexual harassment" and O'Meara accused Dr. Sharifi of what he described as "luring nurses to his office under false pretenses," of employment.

181.   In the same communication, O'Meara ordered Dr. Sharifi to cease and desist inviting any Banner employee to his office.  Dr. Sharifi was prohibited from asking Banner employees for cell phone numbers, and he was even prohibited from texting any Banner employee.

182.   His only contact with Banner employees was limited to speaking to nurses regarding patient care only, and any violation of these prohibitions would result in corrective action or termination.

183.   As a result of these draconian prohibitions, Defendants were able to spread lies and misrepresentations about Dr. Sharifi, who was effectively unable to defend himself or rebut the lies within the Banner community.

184.   Defendants did, in fact, spread lies about Dr. Sharifi, including that Dr. Sharifi is getting divorced (which horrified his wife and children when they heard it repeated);

that Dr. Sharifi offered alcoholic beverages to staff members and nurses (which was designed to embarrass Dr. Sharifi who, as a devout Muslim, does not consume alcohol); that Dr. Sharifi lured staff members under false pretenses; and that Dr. Sharifi offered employment / work in exchange for sexual favors.

185.   Even as the end of 2015 approached, it was readily apparent that there were no credible sexual harassment allegations, and that these claims were being used as a pre-text to attack Dr. Sharifi's reputation.

186.   O'Meara has admitted that neither he, nor any other member of the Medical Staff ever believed there was anything present of a sexual harassment nature in the allegations, but this never stopped him or any other Defendant from characterizing the claims as "sexual harassment."

187.   O'Meara's belief that there was never anything of sexual harassment nature in his "sexual harassment investigation" did not stop him from dragging out the conclusion for more than six months using every opportunity to persecute Dr. Sharifi.

188.   On one occasion, for instance, O'Meara scheduled a hearing on a date when he knew that Dr. Sharif was not available, and then threatened him with summary suspension if he did not appear using Dinner's interpretation of an inapplicable Bylaws provision to support the action.

189.   The only concern that Defendants have ever been able to articulate with Dr. Sharifi's conduct regarding this investigation is his reaction to the false allegations.

190.   According to O'Meara, Dr. Sharifi was unable to appreciate the seriousness of his alleged failure to recognize that some of the claimants misunderstood him to be offering employment interviews.

191.   Although hundreds of other invitees had no trouble discerning the terms of the same or similar offers, O'Meara believed that Dr. Sharifi's failure to recognize that he could be misunderstood raised significant concerns about his judgment.

192.   In this investigation, Defendants displayed what became a familiar pattern: Defendants accused Dr. Sharifi of conduct mischaracterized in a factually inaccurate, unsupportable, (or sometimes even ridiculous) fashion.   No matter how Dr. Sharifi reacted, Defendants mischaracterized his reaction, and then drew unwarranted conclusions that were documented using vague or highly subjective terms.

193.   Dr. Sharifi cooperated fully with this "investigation," but from the very beginning it was obvious that no one believed Dr. Sharifi had sexually harassed anyone, or even engaged in prohibited or disruptive conduct.

194.   Dr. Sharifi expressed his concerns to O'Meara as well as the other MEC members, in three separate letters.

195.   In the first, dated December 4, 2015, Dr. Sharifi identified some of O'Meara's and Dinner's most serious mischaracterizations by comparing the actual words in the HR report to the words used in their letters.

196.   By the date of the second letter (January 4, 2015), Defendants had recast the allegations as disruptive conduct, but still refused to end the matter insisting that it affected patient care.

197.   In this second letter, Dr. Sharifi pointed out that even assuming the truth of the allegations (and most were untrue), the complainants (according to the HR report) indicated that: (1) Dr. Sharifi was courteous and friendly to them before and after (none claimed he had come on to them as O'Meara mischaracterized); (2) a few claimed that he had sent some innocent texts following their visit to the clinic, but those who made this claim also said that when asked, he stopped; and (3) most importantly, all of the claimants (who still worked with Dr. Sharifi) indicated that their work relationship was unaffected, continued to be professional, and had no concerns over patient care.

198.   Some Dr. Sharifi's letters did indicate his firm belief that Defendants had ulterior motives, and had manufactured an investigation and then went in search of anything that could be misconstrued as support.

199.   O'Meara later framed Dr. Sharifi's letters and his reaction to the investigation in general as "unacceptable behavior" that would by itself warrant a reduction or termination of his privileges.

200.   Defendants eventually used this reaction in conjunction with the Maxfield letter five years earlier and attacked Dr. Sharifi's medical, and even mental competency.

201.   When the sexual harassment investigation began, Dr. Sharifi believed that Defendant's motive was retaliation for his testimony in the C. F. case.

202.   Dr. Sharifi also believed that Dinner manufactured or manipulated the allegations to give the appearance impropriety and guilt.

203.   Based on statements made by Dinner and O'Meara, it is now clear that Dr. Sharifi's race and national origin were motivating or determining factors for the pursuit of the baseless allegations which were used to terminate his credentials.

204.   One witness swears she heard Dinner bragging about failed attempts to get rid of Dr. Sharifi, "like drug and alcohol use," which were lies devised by Dinner and interjected into the sexual harassment investigation.

205.   This same witness also swears she heard Dinner vow that even if the present plot (referring to the MEC's investigation that did result in termination) was unsuccessful, she would find another "excuse" – not cause – to eliminate him because even though Dr. Sharifi "knows full well that I [Dinner] pull[s] the strings … he can never prove it."

206.   Sometime in January of 2017, Dr. Sharifi treated an 81-year-old man with disabling DVT symptoms that caused him to become wheel chair bound, and eventually bedridden.

207.    O'Connor prevented Dr. Sharifi from performing venography and PEVI on the patient at BBMC, based on the false claim that Dr. Sharifi's proposed treatment was contra indicated because the patient was actively bleeding.

208.    While the patient had a hematoma in his thigh muscle before Dr. Sharifi's evaluation, he had stabilized with a transfusion, and Dr. Sharifi carefully monitored this condition for four days to be certain any bleeding had resolved.

209.    Only after Dr. Sharifi was satisfied that the patient's bleeding had resolved did he attempt to perform PEVI.

210.    O'Connor then prevented PEVI on the grounds that thrombolysis (a treatment to dissolve dangerous clots in blood vessels, improve blood flow, and prevent damage to tissues and organs) was not indicated, but thrombolysis was not being proposed by Dr. Sharifi.

211.    While PEVI treatments could include low dose thrombolysis if there was a life threatening thrombus which endangered the patient's life, PEVI includes many other forms of treatment such as balloon venoplasty, stenting, and IVUS imaging.

212.    This distinction and clarification was clearly reflected in Dr. Sharifi's pre-intervention notes as was the careful monitoring of the patient's hematoma for a period of four days.

213.    The patient had a previous IVC filter misplacement in 2014, which was supervised by Hu, and this had led to bilateral proximal iliac venous stenosis confirmed by IVUS imaging.

214.    Dr. Sharifi recognized that this patient would remain with significant morbidity and wheelchair bound, which he could easily resolve, so he performed bilateral endovenous intervention at another Banner facility where O'Connor could not prevent it, removed the improperly placed implant, and reconstructed the stenosed iliac vessels with stents.

215.    A few days later, a follow-up visit in Dr. Sharifi's office showed the patient to be fully ambulatory after many months of disability.

216. Naturally, the patient greatly appreviated what Dr. Sharifi had done and even sent him a letter of gratitude.

217. There were no complications related to any of Dr. Sharifi's work on this case, and when the case was eventually reviewed by the BHH Cardiology Committee on May 17, 2017 it was adjudicated "not reckless."

218. In spite of the patient outcome and peer review score, and the fact that the procedure was performed at another facility as O'Connor instructed, Defendants later changed the scoring at BBMC and even this case was used against Dr. Sharifi which was unprecedented both because the case did not involve BBMC and because the peer review at the facility where it was had found no impropriety.

219. If Dr. Sharifi had allowed O'Connor's prevention of treatment to prevail, the patient would still be confined to a wheel chair, so not only was there no harm to the patient, but he had regained full walking function and ambulation after Dr. Sharifi's procedures.

220. O'Connor's refusal to permit PEVI at BBMC in this patient's case raised legitimate concerns over patient health (as well as O'Connor's judgment), including, the uncertainty whether O'Connor would prevent Dr. Sharifi at some the future date from administering direly needed treatment.

221. Hu's faulty placement of the IVC filter also raised concerns about his ability to perform the procedure

222. Dr. Sharifi believed it was his obligation to report these concerns, and he did.

223. However, Dr. Sharifi feared that his report would be used to target him for retaliation based on Defendants' recent conduct.

224. On February 1, 2017, Dr. Sharifi wrote John Hensing, who, at the time was Chief Clinical Officer supervising the CMOs of all Banner facilities.

225.   Dr. Sharifi expressed his concerns about the medical issues, and even predicted that the MEC at BBMC would (instead of investigating O'Connor or Hu) use the case as a pretext for investigating him.

226.   This case highlights another common strategy Defendants employed in order to ensure that the record – at least on the surface – supported the actions taken against Dr. Sharifi.

227.   Although the case had never been peer reviewed, it was used to justify a clandestine and unorthodox investigation into Dr. Sharifi's cases on the grounds that it had been peer reviewed and scored reckless.

228.   Defendants' descriptions of this case were invariably misleading (at best), but certainly corroborated Dr. Sharifi's belief that O'Connor was responsible for pushing the case since they always included an accusation that Dr. Sharifi had scheduled the patient for low dose thrombolytics (which is false) where it was contra indicated.

229.   This seemingly innocuous mischaracterization is significant, however, because Defendants realized they could not justify what they intended on doing to Dr. Sharifi before he was even investigated, unless the charges were vaguely cast in subjective terms such as judgment, patient selection, or unnecessary risk taking (and even then, Defendants would have to ignore the fact that Dr. Sharifi's patients were all doing remarkably well).

230.   O'Meara and other MEC members later claimed that they had discussed Dr. Sharifi "extensively" before launching their intensive review, but the bulk of this discussion most likely was comprised of figuring out how to get rid of him.

231.   Defendants were aware that accusations like patient selection or unnecessary risk taking could be anchored to the fact that Dr. Sharifi often does perform procedures where Defendants could point to contraindications in the patient's medical history.

232.   Just as Dr. Sharifi had predicted, approximately one month later, on March 2, 2017, O'Meara informed him that the MEC had met and he was now the subject of a "review."

233.    Dr. Sharifi never received any written notice or explanation before or after the MEC's March 2, 2017 meeting of the specific identified concerns it had reviewed in violation of Section 8.2.3 of the Bylaws.

234.    Dr. Sharifi was ordered to appear before the committee the following morning at 7:30 a.m. to discuss "allegations of quality of care concerns."

235.    Since Dr. Sharifi had not been notified of any quality of care concerns prior to March 2, 2017, and none of his cases had been the subject of peer review recently, he requested information regarding the nature of the concerns or the patients involved so he could be prepared to intelligently respond to any concerns.

236.    O'Meara refused to reveal anything other than that the two cases were allegedly scored "reckless cases," which was even more confusing since Dr. Sharifi had never had any of his cases scored "reckless" by peer review.

237.    Dr. Sharifi eventually guessed the two cases from the vague references made at the meeting the following morning.

238.    One case had occurred in 2015 and peer review scored it "non-reckless," and another that had never even been vetted by the standing Cardiology Committee responsible for peer review.

239.    The case involving O'Connor and Hu was soon added to the other two cases, even though Dr. Sharifi had reported O'Connor and Hu's conduct – not vice versa.

240.    On March 3, 2017, without any warning, reason, or justification, O'Meara instructed him to refrain from exercising clinical privileges.

241.    No specific clinical cases were identified during this meeting.

242.    When Dr. Sharifi asked for specifics and offered to respond to concerns he was told: "you can talk as much as you want but it will not get you anywhere".

243.    During this meeting, in another unprecedented move, O'Meara advised him that he must immediately:

- refrain from practice in the use of tPA.
- refrain from practice in the use of thrombolytic agent.
- refrain from practice in the use of vascular thrombectomy
- refrain from practice in IVC filters until the "focused group" work is completed.

244.   O'Meara later expanded the prohibition to include the requirement that Dr. Sharifi refrain from any administration of tPA for PE.

245.   Even though the pretext used for the termination of Dr. Sharifi's privileges was related to side effects of tPA, other procedures which had nothing to do with tPA were also restricted, in essence eliminating his endovenous practice.

246.   So the result Defendants had been unable to accomplish in an honest and professional way, through fair and healthy competition – referrals for their own physicians and practices – O'Meara and his focused group were able to accomplish with one threat.

247.   Dr. Sharifi was effectively prevented from performing any procedures in the niche where his special knowledge training and skill flourished – at BBMC at least – and where he got his referrals.

248.   Dinner recognized another malicious, and intended consequence of the lack of referrals was that Dr. Sharifi would be unable to finance any effective defense or legal action to oppose Banner.

249.   In Dinner owns words, it is "payback time" for Dr. Sharifi "the idiot Iranian Muslim," which means (among other things) that she would "cancel his calls and contracts," and "personally make sure nobody will refer to him" because she was not about to allow him to "finance his attorney's fees with our patients."

250.   O'Meara threatened that unless Dr. Sharifi agreed to refrain voluntarily from exercising his clinical privileges, BBMC would report him to the Arizona Board of Medical Examiners (BOMEX), and that the only way to avoid this was to voluntarily refrain.

251.    When O'Meara refused his request for time to consult with an attorney, Dr. Sharifi chose to temporarily refrain from performing certain procedures – the option that supposedly would not involve a report to BOMEX.

252.    O'Meara reported Dr. Sharifi to BOMEX despite his promise.

253.    BOMEX eventually reviewed the same cases that Defendants used to justify termination of his privileges, but BOMEX determined that Dr. Sharifi's medical care at all times met or exceeded the standard of care.

254.    Banner appealed that decision and BOMEX performed a second review with additional reviewers, and again, a second time determined that Dr. Sharifi's medical care at all times met or exceeded the standard of care.

255.    Defendants eventually filed at least four separate complaints against Dr. Sharifi with BOMEX, and in every instance Dr. Sharifi was exonerated.

256.    At the March 3, 2017, meeting O'Meara claimed that "recently the MEC reviewed 2 cases that were viewed as reckless and that there were concerns about appropriateness of tPA, technique, number of venous stents that were being placed and use of tPA in contraindicated cases leading to initiation of focus groups."

257.    Interestingly, Case A (D. F.) was brought up in peer review in 2015 and after careful review assigned the designation Q 2 D2 which specifically means "no recklessness."

258.    In D. F.'s case, the patient developed rapidly progressive phlegmasia cerulea dolens (PCD) after two complicated spine surgeries and was facing imminent death or loss of limb.

259.    PCD poses a 70% risk of death or limb loss with anticoagulation alone, and Dr. Sharifi performed PEVI on the patient, saving his life and limbs.

260.    However, a small hematoma occurred at the surgery site requiring surgical evacuation, but after evacuation the patient went back to baseline status and his PCD resolved.

261.   This had all occurred in 2015, and the case went to peer review with no reckless finding.

262.   Dr. Sharifi had fully discussed the risks, benefits, and alternatives with the patient before undertaking PEVI.

263.   In Case B (P. V.), P.V. developed acute on chronic extensive DVT involving both femoropopliteal, iliac veins and IVC leading to the patient reported "feeling miserable" being in constant pain and causing her to be wheelchair bound (she had previously been fully ambulatory).

264.   A series of errors occurred by the hospital, radiology and pharmacy which included failure to begin anticoagulation treatments that would have prevented the DVT months earlier; misreading / misinterpretation of CT scans by radiologists and neurologists; and, the pharmacy changing – without consulting or informing Dr. Sharifi – the concentration of tPA prescribed to the standard dose which is five times higher than Dr. Sharifi had specified.

265.   Unfortunately P.V. developed intracerebral hemorrhage the following day and died a few days later.

266.   P. V.'s case occurred in August 2016, and was not selected for peer review until March 2017, after retaliatory measures by O'Connor, and O'Meara commenced.

267.   So, at the time of the MEC's meeting, in a span of approximately six years, Dr. Sharifi had only had two peer review notifications, and one was a document/communication issue receiving Standard II grade.

268.   The other was Case A described above.

269.   O'Meara now claimed that the MEC had determined that Case A and B were "reckless" and formed a focused group to investigate Dr. Sharifi more intensely without any authority in the Bylaws for such actions.

270.   This began a long series of violations, which also included violations of written policies and procedures, as well as actions taken against Dr. Sharifi that had never

happened to any other physician at Banner – even physicians who really <u>were</u> negligent and/or incompetent.

271.   O'Meara also informed Dr. Sharifi that he could not perform any procedures on any BBMC patient, at any other Banner facility, even though O'Meara had no authority to impose restrictions on Dr. Sharifi at other Banner facilities.

272.   During the March 3, 2017 meeting Dr. Sharifi was told that it was, in fact, O'Connor who initiated whatever it was the MEC was doing, but this was not problematic because O'Connor would not have a vote in the final decision.

273.   Dr. Sharifi further asked if he could make some brief comments, but was told it would do no good.

274.   Dr. Sharifi was confused why such serious consequences were being imposed without any adherence to the peer review process, and O'Meara told him that his actions were so serious they decided not go through peer review.

275.   Defendants could not articulate any specific clinical reason for their unusual and draconian measures except for "serious concerns," and when pressed, offered "that they had had lots of discussions about him," but doubted that Dr. Sharifi would ever have the opportunity offer a defense, or present studies or literature to support his positions.

276.   Defendants further told Dr. Sharifi that his lawyer would know what to do when they finished their focused review (of course, Dr. Sharifi had not hired any lawyer yet, and the focused review had not even begun); but, as to the actual review, the focused group would handle that and not his peers.

277.   A later memo to the file prepared by O'Meara largely confirms that Dr. Sharifi's perception and recollection of the March 3, 2017 was correct, although the motive attributed to their actions is couched as "concerns for patient safety."

278.   O'Meara's memo implied that Dr. Sharifi was taking extreme risks with his patients.

279.   However, in all Dr. Sharifi's PEVI procedures performed at BBMC there had only been two bleeding complications – an outstanding record, and especially in light of Defendant's accusations of medical incompetence.

280.   During this same timeframe, there was only one death even related to any treatment that Dr. Sharifi had performed, but the death of P. V. was not the result of anything Dr. Sharifi had done.

281.   Although O'Meara's characterization of this group as a "focus group" similarly found no support in the Bylaws or Banner procedures, this was an appropriate moniker because the "focus" of this group – and it was intensely focused on it – was ,to use Defendant's own words "to get rid of the f***ing Iranian [Dr. Sharifi]" and "no matter the cost."

282.   Defendants knew they had the protection of immunity so long as any actions or decisions they committed could be couched in terms of peer review activities or participation in those activities.

283.   Defendants also knew that while the materials generated during the process of terminating Dr. Sharifi were confidential according to Arizona's peer review statutes, these materials could be subject to a review in the event Dr. Sharifi filed an injunction action.

284.   Over the next several months, Defendants employed tactics that would make Alinsky, or even Stalin, proud, and when the formal decision to terminate Dr. Sharifi's privileges at BBMC was finally made, his medical incompetence – according to Defendants – was so obvious that even the lab technicians knew – some allegedly reported unnecessary procedures performed ten years earlier, another claimed he told Dr. Sharifi not to perform a procedure "that way" but Dr. Sharifi continued in spite of this instruction, others even claimed that Dr. Sharifi was ignorant of basic human anatomy.

285.   According to Defendant's characterization, Dr. Sharifi's incompetence was right under their noses for at least ten years, and no one – except a few nurses and lab technicians – noticed it.

286.     This testimony was never offered by the lab technicians or nurses themselves, but rather through O'Meara and others.

287.     During the first few weeks of March of 2017, Dr. Sharifi attempted unsuccessfully to obtain an explanation, identification of a case, or even description of the MEC's concern that warranted such unprecedented actions.

288.     Defendants refused to identify any specific clinical cases, or any authority under the Bylaws for conducting the "focused review" and/or "investigation."

289.     As weeks passed Dr. Sharifi was variously notified that while no real concerns had been identified, the "focused review and the peer review process have been initiated and will take their courses," and that he would be informed of "concerns, **if any**, once the review" was completed, and given the opportunity for "an interview **if concerns are identified**." (Emphasis added).

290.     On March 15, 2017 (in Dr. Sharifi's absence), the Cardiology Committee completed its review of the three cases Dr. Sharifi had suspected were used to precipitate the investigation.

291.     Based on false evidence fabricated by James A. Del Giorno, M.D. (Del Giorno) as well as other material information he intentionally concealed, at the March 15, 2017 hearing, the Cardiology Committee found reckless behavior in two of the three cases.

292.     Dr. Sharifi requested an appeal of the scoring on these two cases since he suspected that Del Giorno had misled the Committee.

293.     Dr. Sharifi presented his appeal to the Cardiology Committee on May 17, 2017. The initial scoring of the cases was changed to not "reckless" in one case and "entirely dismissed" in another.

294.     Defendants refused to provide Dr. Sharifi with a copy of the Cardiology Committee's final determination on these cases in violation of BBMC Peer Review Policy #MS-006, which requires that all reviews be completed within 90 days and that the practitioner who is

subject to the review be presented with a copy of the reviewing committee's final determination and an opportunity to submit a written response to be maintained in their medical staff file.

295. Dr. Sharifi's request to review the misleading comments that Del Giorno made to the MEC was ignored, and anytime he attempted to submit written responses to the evaluations performed on him, he was accused of attempting to interfere with the peer review process, and the letter was retained in his medical staff file for the purpose of using it against him later.

296. On April 12, 2017, O'Meara informed Dr. Sharifi that the MEC had concluded that the investigation was warranted, and sixteen cases would be sent for external review by the MEC.

297. The three peer review cases were included in the list of sixteen that the MEC selected for external review, even though Dr. Sharifi had requested an appeal on two of the three cases.

298. No significant clinical issues were identified in any of the other 13 cases identified by O'Meara, and nine of the sixteen were eventually dismissed.

299. On April 17, 2017, Dr. Sharifi finally retained legal counsel, and immediately his attorney, Michael Goldberg (Goldberg), began exchanging correspondence with Dinner, outlining BBMC's numerous, repeated violations of the Medical Staff Bylaws and peer review policy.

300. Dinner attempted to couch the whole matter as a "non-adversarial" peer review process, but this statement contradicted O'Meara who referred to the matter as an "investigation" (a pre-corrective action measure), which must be completed within two weeks.

301. As for the external review, Dr. Sharifi begged Defendants to comply with the Bylaws requirement that the review be performed by a physician having the "same subspecialty" and "board certification" as Dr. Sharifi, and that the reviewer have "no conflict of interest or even appearance of conflict of interest with Banner and the MEC."

302.    In one of many examples involving the Bylaws, Dinner instead petitioned for a change in BBMC's Bylaw provision regarding the requirements of the external reviewer.

303.    Dinner pushed the change in the Bylaws after Goldberg objected to the qualifications of the external reviewer that was selected by BBMC, and the quoted language from the Bylaws was removed to his determinant in the midst of the ongoing review.

304.    Defendants characterized Dr. Sharifi's efforts to enforce his rights under the Bylaws or object to Defendants' violations of Bylaws as "inappropriate", "improper", an "effort to interfere with the peer review process of the Medical Staff", and further stated that any communications from Dr. Sharifi or his attorney would be viewed as "disruptive behavior" on his part and constitute an independent basis for disciplinary action against him.

305.    On June 22, 2017, the MEC had considered the results of Defendant's "external" review – which was not external at all, but rather an unidentified member of Banner's medical staff – and imposed corrective action against Dr. Sharifi on the basis of purported "patient care and record keeping concerns."

306.    Dr. Sharifi challenged this corrective action and presented his defense to the MEC on July 20, 2017.

307.    Dr. Sharifi's presentation must have made some impression on the MEC because they deferred any action on his case until they could get their reviewer to correct some of the more obvious flaws in their claims against him.

308.    Dr. Sharifi offered the reviews of three other internationally renowned experts in his field in response to Defendant's internal review, and the MEC recognized that although there was a difference of opinion on standard of care issues, there was probably was no clear standard of care on some of these issues, and even when there was, Dr. Sharifi's care was well within it.

309.   This was emphasized by what one of Dr. Sharifi's experts used as a starting point on each case – patient outcomes and complications.  Nearly every one of the cases had no complications, and even the few that did were not the result of Dr. Sharifi's treatment.

310.   Except in the case of P. V., the patient outcomes were excellent, and in some cases – as a result of the same treatments Defendants called reckless and dangerous – patients who had been bedridden, or wheel chair bound, completely regained ambulation.

311.   Defendants also acknowledged that the available imaging provided to their reviewer (and in some cases the only imaging available) did not include imaging essential to many of their reviewer's conclusions and criticisms, but this could be construed as Banner's failure to maintain the proper records – one the accusations the MEC made against Dr. Sharifi.

312.   The MEC could not even decide which cases actually supported their positions.

313.   After basing its initial review on two cases, to which a third (the 2017 case where O'Connor prevented treatment) was soon added, the MEC increased the number of cases to eight, and then reviewed sixteen, but suddenly dropped nine of these cases.

314.   Most significantly, however, Defendants realized that none of the issues predetermined to be the basis for Dr. Sharifi's termination – without any evidence before the investigation began – had been addressed by either set of reviewers.

315.   It was untrue that neither set of reviewers had addressed these issues. Concerns regarding patient selection were negated by the medical appropriateness of the diagnosis, and confirmed by the resolution of the symptoms as a result of Dr. Sharifi performed the procedures.

316.   Concerns regarding decision making and evaluation of risks were rebutted by the fact that there were "no complications," and "excellent outcomes."

317.   Not even Defendant's hand-picked reviewer had specifically documented issues like "patient selection," "clinical decision making," "poor documentation," and

"unnecessary risk taking," and these excuses had already been put in writing to justify the whole investigation.

318.   Defendants deferred judgment in this meeting until their reviewer could complete his "rebuttal" of Dr. Sharifi's experts, although Defendants had already reviewed the "preliminary" rebuttal and expected the final report to include the necessary conclusions.

319.   So, according to Defendants, the standard of care was too uncertain and undefined, but highly subjective determinations like "clinical decision making," or "unnecessary risk taking" were both sufficiently concrete to use as a standard, and to make the determination that Dr. Sharifi violated it.

320.   Defendants received the rebuttal report and met again on August 5, 2017 to vote on Dr. Sharifi's fate – the decision had been before the investigation even began, but just in case any of the MEC's less prejudiced members were still wavering, portions of Dr. Sharifi's letters from 2009 (Maxfield) and 2015 (sexual harassment), but only those that could be construed as threatening or accusatory, were read aloud to rally the vote.

321.   The result was that the MEC required Dr. Sharifi to sign a stipulation that every case he performed (without a defined duration) would be subject to prospective approval by one of Defendants (for patient safety) and retrospective review by one of Defendant's internal reviewers (to evaluate the procedures).

322.   Even Defendants must have recognized how outrageous and unjustified this punishment appeared given the evidence because someone on the MEC quickly noted that – when you get right down to it – what the MEC was "proposing" to Dr. Sharifi is really "what is expected of any physician on the medical staff."

323.   On August 9, 2017, O'Meara emailed Dr. Sharifi a "Stipulation Agreement" based on the MEC's decision, based entirely on a report that the MEC had recently acknowledged did not really support their predetermined conclusions.

324.    The Stipulation Agreement demanded that Dr. Sharifi forego his due process rights and voluntarily relinquish any claims arising from the adverse actions taken against him by BBMC, its medical staff, and all officials involved.

325.    Dr. Sharifi refused to sign the Stipulation Agreement, but continued to plead the facts of his case – even to the MEC on one occasion in October of 2017 – and protest the injustice of Defendants' punitive actions against him.

326.    On this particular occasion, Dr. Sharifi spoke passionately about the history of the focused review, but was promptly shushed by O'Meara when he started to "discuss peer and what reckless means."

327.    Dr. Sharifi was also still convinced that Defendants' motivation stemmed from his testimony in the C. F. case, even though the MEC members vehemently denied having any knowledge of the case.

328.    When Dr. Sharifi explained that certain members did know about the C. F. because they had discussed it with him, the MEC took the opportunity ask him some telling questions, like just who did he represent, and who asked him to give a deposition?

329.    The following day, on October 6, 2017, O'Meara cited the C. F. case as grounds for adopting the restrictions on Dr. Sharifi's privileges previously "proposed" as a requirement.

330.    In addition, O'Meara's letter regurgitated the same meaningless accusations regarding judgment, patient selection and decision-making without pointing to any corresponding medical issues, and somehow twisted his care for his patients (just like everything else) into "an unnecessary risk pose[d] to patients."

331.    At the hearing eventually conducted on the termination of Dr. Sharifi privileges, several of these patients (and/or their loved ones) actually came to support Dr. Sharifi.

332.    Hu's assignment was to stand outside the hearing room, trash Dr. Sharifi, and intimidate any witnesses or others who came to support him.

333. One of these witnesses was Ann Baker, a former administrative employee at BBMC, whose father was a patient of Dr. Sharifi.

334. Ms. Baker came to testify on his behalf, but after listening to Hu rant about Dr. Sharifi killing and paralyzing his patients, Ms. Baker was confused, and wondered how the Chairman of Banner's Radiology Department say such things unless they were true.

335. After mulling it over, she decided to leave without testifying.

336. Ms. Baker later realized what had happened and signed a sworn Declaration about the event and what Hu had done, but there were surely others who have been silenced or chased away.

337. After Dr. Sharifi rejected the MEC's proposal, the MEC decided to summarily impose the adverse action against Dr. Sharifi on September 7, 2017.

338. Thereafter, the MEC attempted to progress through the hearing procedures outlined in Article 9 of the Bylaws.

339. In November 2017, during a prehearing conference, counsel for the MEC and the hearing officer acknowledged a flaw in the Bylaws that prevented the selection of the hearing committee.

340. Section 9.3.1 of the August 13, 2015 and September 13, 2017 Bylaws (which had just been hurriedly modified to Dr. Sharifi's determent once already) actually still mandated that, "[n]either the committee members nor the person appointing the committee members may...have other significant bias as to the outcome of the Hearing; or have actively participated in the consideration of the Adverse Action."

341. Under Section 9.3.2 of the Bylaws, only officers of the MEC (President, Vice President and Secretary/Treasurer) were authorized to appoint the hearing committee. However, the entire MEC had actively participated in consideration of the adverse action against Dr. Sharifi as the MEC decided to impose the adverse action against Dr. Sharifi.

342.   The MEC clearly could not qualify under the provisions and consequently all persons eligible under section 9.3.2 of the Bylaws to appoint the hearing committee were disqualified under section 9.3.1.

343.   As a solution, counsel for Dr. Sharifi proposed that the parties have the hearing before a committee that was mutually agreed upon by Dr. Sharifi and the MEC, with each party selecting three physicians to serve, or alternatively, that the parties have the hearing before an arbitrator mutually acceptable to the MEC and Dr. Sharifi.

344.   Defendants rejected Dr. Sharifi's proposal claiming that new members would be appointed to the MEC on January 1, 2018, so – according to Defendants – a hearing committee be appointed without violating the Bylaws.

345.   Dr. Sharifi received no further communication on the status of the hearing until February 12, 2018, when the MEC notified him that it had met on December 7, 2017 (more than two months prior) and reaffirmed the adverse action.  The MEC further stated, "...as you have already requested a hearing, we assumed you intend to proceed with the hearing and will schedule it forthwith."

346.   Just four days prior, on February 8, 2018, the Bylaws had been amended a second time, and these amendments made substantive revisions to the fair hearing procedures outlined in Article 9, that conveniently, removed the requirement in Section 9.3.1 of the Bylaws that the person appointing the hearing committee not have a significant bias as to the outcome of the hearing, and that he or she not have actively participated in consideration of the adverse action in order to undermine Dr. Sharifi's objection to the MEC selecting the hearing committee.

347.   Defendants had decided – with this amendment – that they were not taking any chances and included a number of other amendments that just coincidentally retroactively nullified nearly every substantive or procedural objection Dr. Sharifi made, such as: prohibiting the practitioner from attending any prehearing conference if he is represented by counsel, in order to undermine Dr. Sharifi's demand to be present at the prehearing conference; and, prohibiting

persons other than members of the hearing committee from participating in the hearing committee's deliberations following the hearing.

348.    Dinner also made sure that she appointed her good friend, Randall Yavitz, as the hearing officer to conduct the "fair and impartial hearing," and one of his first items of business was issuing the decision that all of the Bylaws changes were valid and applied retroactively to Dr. Sharifi's case.

349.    Later, after Dr. Sharifi's hearing, a witness swore she overheard Dinner gloating over "the great job" her buddy Randy (the hearing officer Yavitz) did on Dr. Sharifi's appeal hearing where he [Yavitz] "swayed the hearing panel," of course.

350.    On December 12, 2018, Dr. Sharifi received a letter from Lamont Yoder, the Chief Executive Officer of BBMC and BGMC.

351.    The December 12, 2018, letter informed Dr. Sharifi that the Physician Services Agreements in place between him and the Banner hospitals were being unilaterally revoked and that he no longer had privileges with respect to the non-invasive cardiology panels.

352.    Termination of the Physician Services Agreements was the result of Defendants' relentless efforts to impair and eliminate Dr. Sharifi's contractual relationship with Banner and its affiliated facilities, as well as the contractual relationships (both existing and prospective) with his patients.

**DISCRIMINATORY INTENT**

353.    During the months that Dr. Sharifi was under intense review, and his privileges were restricted, he sensed that it was the result of retaliation either by O'Connor, or Banner administration in general for his testimony in C. F.'s case.

354.    During this same period of time, Banner was negotiating the acquisition of EVDI and the formation of Banner Imaging (BI), with the expectation that BI would have a monopoly on referrals.

355.   Dr. Sharifi was the primary competition of EVDI and BI for any venous work.

356.   As a result of the Banner Imaging deal, many of the same physicians who had always disliked Dr. Sharifi or even actively opposed him, became Banner employees, and many already held positions as department chairs or committee members.

357.   Dr. Sharifi believed that these factors explained the motivation to eliminate him, but these explanations still left many unanswered questions, and Dr. Sharifi was aware of instances in which derogatory racial epithets were used in reference to him (even by some of Defendants).

358.   Beginning sometime in approximately 2015 when the sexual harassment investigation was initiated, Dr. Sharifi perceived a particularly pointed callousness, and perhaps even cruel intensity in Defendants' actions towards him that was difficult to fully explain by simple competition or professional jealously.

359.   For instance early on, when Dr. Sharifi sensed that O'Meara, Del Giorno, O'Connor and Dinner were misleading and (thereby manipulating) some of the other MEC members, he pleaded (in letters) to participate in the review of his cases.

360.   O'Meara always refused, and even threatened him with suspension for sending any information to the MEC members that did not go through him.

361.   Dr. Sharifi's attempts to offer peer reviewed literature, explanations on his cases, and even in some instances offers to show the MEC documentation they accused him of failing to obtain, were all characterized as threats, intimidation, bullying or even worse.

362.   In one instance, Dr. Sharifi respectfully, and without any threatening or provocative language or tone, provided the MEC members with a letter outlining the facts.

363.   O'Meara immediately characterized Dr. Sharifi's letter as an "unwelcome" act of "harassment," which demonstrated a "severe and pervasive," pattern of "intimidation" additionally construed as "retaliation" against the MEC's legitimate concerns.

364.    As a result, O'Meara and the other Defendants considered Dr. Sharifi's attempts to be involved in the peer review process as nothing more than an attempt to "derail the whole process," and consequently, as absurd as it sounds, determined from this that he had "effectively refused to participate in the peer review process" as required by the Bylaws.

365.    Defendants mocked Dr. Sharifi's belief that the focused review was retaliation initiated by O'Connor, who literally told Dr. Sharifi that he "would make sure his privileges were revoked" because, they snickered, O'Connor doesn't literally "have the authority to revoke privileges."

366.    Defendants ignored obvious retaliation, and yet somehow interpreted Dr. Sharifi's spirited, and persistent defense, using only facts and science without any threats – and if there were, no consequences that Dr. Sharifi could impose – as retaliation against them.

367.    When Defendants accused Dr. Sharifi of improprieties – even rather innocent allegations – Defendants completely rejected his denials, explanations, and even proof, but then later nonchalantly dismissed Dr. Sharifi's accusations against them with nothing more than simple denials, followed occasionally by "that's ridiculous," or he "would never jeopardize his practice" by doing that.

368.    Several times during the course of the investigation, Dr. Sharifi – who is the expert – tried to educate Defendants on the current science and research in his field, always respectfully, typically accompanied by a request for the opportunity to personally present, always using facts, journal articles, and research data, but Defendants instead accused him of arrogance, and even viewed the attempts as demonstrating his "disregard for science."

369.    At some stage during the plot to eliminate Dr. Sharifi "at all costs," Defendants started to spread ugly lies about Dr. Sharifi including that he had killed or paralyzed patients through his medical incompetence which came directly from Del Giorno (who claimed that Dr. Sharifi killed P. V.) and O'Connor (who claimed that he caused paralysis in the 2017 case).

370.    Other variations of these statements, as well as other defamatory matter that originated with Defendants, rapidly spread throughout the Banner community, and have been heard by many physicians and others.

371.    Then Dr. Sharifi obtained the sworn Declarations of two witnesses who heard various Defendants discussing Dr. Sharifi and the investigation by the MEC.

372.    A physician formerly affiliated with Banner, Dr. Ava Rose, executed a Declaration stating that she heard a conversation between Hu, Maxfield and Lyons sometime in September or October of 2017 when the MEC was concluding its focused review, and the EVDI / Banner Imaging deal was waiting to close. See Declaration of Ava Rose, M.D. attached hereto as Exhibit A.

373.    During this conversation, Hu admitted that he was nervous about making false allegations against Dr. Sharifi that "were so ridiculous," he could not believe the Medical Executive Committee (MEC) "bought it."

374.    Hu attributed his success to Dinner who told him just to say "standard of the community."

375.    Dinner is also responsible – according to the group – for drafting one of the reviewing physician's reports (Dr. Hirsch) after "he screwed up" so badly that the plot to get Dr. Sharifi almost failed – undoubtedly referring to the first review that failed to even address the predetermined excuses they had advanced for Dr. Sharifi's investigation.

376.    After reassuring themselves that such reprehensible conduct is somehow defensible by repeating the mantra "he's a terrible doctor and kills patients," the group encouraged Hu not to worry about details like the truth if he testifies in the upcoming appeal (because Dinner will cover it all up), but instead to go in there and "F… this F …ing Iranian" who has the nerve to cut into "their DVT practice."

377.    According to this group, the orders have come directly from Fine, Volk and other key board members who want Dr. Sharifi gone at all costs, no matter what.

378.    O'Meara, Maxfield claimed, would do whatever is necessary and would even falsify evidence, and if he refused, Dinner would simply "get him fired on bogus grounds," which is her expertise, "falsify and fire," Maxfield chanted and then added "I am glad we are not her targets."

379.    In a separate incident, while on the floor of the hospital, Dr. Rose witnessed a nurse ask O'Meara about a VTE patient and whether the patient should be referred to Dr. Sharifi because of his expertise.

380.    Another cardiologist joined the group who apparently believed the patient "belonged" to him, and O'Meara "whose face had become livid," angrily stated to the nurse that Dr. Sharifi is "a terrible doctor who kills patients with tPA," and has been reported to BOMEX which chased away the nurse.

381.    O'Meara then turned to his colleague, and in reference to Dr. Sharifi stated that "this f…ing Iranian has taken the whole damn referrals.  Just look.  I've suspended him and he is still getting referrals on our patients. Unbelievable.  In this day and age that Muslims are hiding, he has rejected the stipulation agreement of the hospital. Dinner, and the whole board are going to teach him a lesson that he won't forget."

382.    Dr. Sharifi has also obtained a Declaration from Leslie Wilson, a certified cardiac sonographer in private practice who worked at various Banner facilities until November of 2018.  See Declaration of Leslie Wilson attached hereto as Exhibit B.

383.    Ms. Wilson witnessed Dinner, along with another individual she did recognize, leaving the Banner Baywood Medical Facility sometime in the fall of 2018.

384.    Dinner was on a cellphone, but it appeared as though she was addressing the individual accompanying her as well.

385.    As Dinner paused in the atrium of the hospital to finish her conversation, Ms. Wilson heard her say, among other things that: (1) Dr. Sharifi is a terrible doctor who "kills patients" and is otherwise "a danger to patients" in Arizona; (2) the "idiot Muslim Iranian" dared

to sue her and she "will make his life a living hell"; (3) that Dr. Sharifi is "a danger to the system" and the administration at Banner wants him "fired no matter the cost"; (4) that Dr. Sharifi – in addition to everything else done to him – must be made "an example so nobody dares testify against" Banner; (5) referencing other failed attempts to get rid of Dr. Sharifi, "like drug and alcohol use," which were lies devised by Dinner in connection with the sexual harassment charges, she vowed that even if the present plot is unsuccessful, she will find another "excuse" – not cause – to eliminate him; (6) because even though Dr. Sharifi knows full "well that I [Dinner] pull[s] the strings … he can never prove it"; (7) and she even gloated about "the great job" her buddy Randy (the hearing officer Yavitz) did on Dr. Sharifi's appeal hearing where he [Yavitz] "swayed the hearing panel," of course.

386.    Ultimately, it matters little to Dr. Sharifi – whose reputation and career may have been ruined by these conniving and callous bigots – to discover that many of his suspicions were correct, from the charges being manufactured to the persons responsible.

387.    But these statements also reveal – out of their own mouths – one of Defendants' primary motivations which also conveniently served as an excuse for conduct so reprehensible they would never have directed it at a physician of any other racial group.

388.    Defendants justified their actions since Dr. Sharifi was just an Iranian and a Muslim as if that somehow excused it.

389.    The timing of actions taken against Dr. Sharifi combined with the disparaging statements made about Dr. Sharifi establish that his race and national origin were a primary motivation for Defendants actions and hostility.

390.    Defendants have further shielded additional racist rhetoric and motivations through invocation of Arizona's "peer review privilege" codified at A.R.S. § 36-445, et. seq.

391.    The "peer review privilege" has been used to cover years of conversations, activities, and decisions that occurred in connection with their adverse behavior toward Dr. Sharifi.

392.     The peer review process implemented by Defendants was, in and of itself, a vehicle designed to foster and facilitate the racist behavior that resulted in the harms alleged herein.

393.     The claimed "peer review privilege" cannot be used to facilitate racist policies and procedures that violate Dr. Sharifi's civil rights as protected by 42 U.S.C. § 1981.

**COUNT ONE**
Violations of 42 U.S.C. §1981

394.     The allegations contained in the preceding paragraphs are incorporated herein in their entirety.

395.     Banner hospitals maintain Bylaws to govern the relationship between physicians and the hospital.

396.     The applicable Bylaws formed a valid and enforceable contractual relationship between Dr. Sharifi and the Banner health hospitals, specifically BBMC and BGMC.

397.     Additionally, Dr. Sharifi maintained Physician Services Agreements with BBMC and BGMC.

398.     The Physician Services Agreements were valid and enforceable contracts.

399.     The benefits and privileges provided to Dr. Sharifi under the Physician Services Agreements and applicable Bylaws have been impaired and eliminated due to Defendants' racist actions and motivations.

400.     Defendants' actions have also impaired and affected Dr. Sharifi's ability to receive future contracts and referrals through networks outside of the Banner health systems.

401.     The adoption of new Bylaws targeted to eliminate Dr. Sharifi's privileges was an act of discrimination. It is evidence of the policy and practice of discrimination implemented by Defendants.

402.     Section 1981 offers relief when racial discrimination blocks the creation or enjoyment of a contractual relationship. It provides that "[a]ll persons . . . shall have the same

51

right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . ." The protections of Section 1981 extend to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

403.    As a man of Muslim and Iranian heritage, Dr. Sharifi is a member of a class protected by Section 1981.

404.    Defendants have engaged in racial discrimination that has impaired Dr. Sharifi's ability to enjoy the privileges, terms, and conditions of the contractual relationship established through the Physician Services Agreements, Banner Bylaws, and applicable codes of conduct which form the contract between Banner and Dr. Sharifi.

405.    As a result of Defendants' discriminatory behavior, Dr. Sharifi has suffered financial, reputational, and emotional injuries, for which he is entitled compensation and redress.

406.    Banner is vicariously liable for the actions taken by the other Defendants named in this matter.

407.    As a result of Defendants' actions as outlined in this Complaint, Dr. Sharifi has suffered damages to be proven at trial.

408.    Defendants actions were done with malice and reckless indifference to Dr. Sharifi's federally protected rights such that an award of punitive damages should be made to .both punish Defendants and deter such conduct in the future.

409.    Dr. Sharifi is entitled to punitive damages due to the intentionally discriminatory conduct of Defendants.

410.    Dr. Sharifi is entitled to punitive damages against Banner because Banner either employed or is otherwise legally responsible for Defendants who served in a managerial capacity and committed the acts of intentional discrimination at issue while acting in the scope of employment, while Banner failed to act in good faith to comply with federal law.

1

## **RECOVERY OF FEES**

2           Because this action arises under 42 U.S.C. § 1981, Dr. Sharifi is entitled to recover

3     his attorneys' fees and any expert witness fees according to 42 U.S.C. § 1988(a)-(c)

4

5

## **JURY DEMAND**

6           Dr. Sharifi requests a trial by jury as to all triable issues.

7

8           RESPECTFULLY SUBMITTED this 20th day of December, 2019.

9

10                                  WILLIAM A. MILLER, PLLC

11

12                          By  /s/  William A. Miller
                                8170 North 86th Street, Suite 208
13                              Scottsdale, AZ  85258
                                *Attorney for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

1

**CERTIFICATE OF SERVICE**

2
  I hereby certify that on December 20, 2019, I electronically transmitted the foregoing

3
document to the Arizona Federal District Court Clerk's Office using the CM/ECF System for

4
filing and transmittal of a Notice of Electronic Filing to all registered Filing Users through the

5
Court's Electronic Filing System.

6

7
                                    /s/ Stephen D. Smith

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26