**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Seyed Mohsen Sharifi Takieh,

Plaintiff,

v.

Banner Health, et al.,

Defendants.

No. CV-19-05878-PHX-MTL

**ORDER**

Before the Court are fully briefed Motions to Dismiss (the "Motions") filed by three groups of Defendants. (Docs. 53–55.) The Court rules as follows.

## I.    BACKGROUND

The First Amended Complaint ("FAC") alleges the following facts, which the Court takes as true for purposes of resolving the Motions. *See Everest & Jennings, Inc. v. Am. Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir. 1994). Plaintiff Seyed Mohsen Sharifi Takieh, M.D., ("Dr. Sharifi") is an Iranian immigrant of Arab descent. (Doc. 50 ("FAC") ¶ 32.) For 13 years, Dr. Sharifi maintained active medical staff membership and clinical privileges at several hospitals within Defendant Banner Health's ("Banner") network. (*Id.* ¶ 123.) A Physician Services Agreement ("PSA") governed Dr. Sharifi's relationship with each hospital. (*Id.* ¶ 125.) In December 2018, following a 21-month investigation, Banner revoked Dr. Sharifi's PSAs and terminated his clinical privileges. (*Id.* ¶¶ 233, 351–53.)

In this lawsuit, Dr. Sharifi alleges Banner revoked his PSAs because of a racially motivated campaign pursued by Defendants Michael O'Meara, M.D., Janice Dinner,

Stephen Hu, M.D., Steven Maxfield, M.D., James Lyons, M.D., Michael O'Connor, M.D., Peter Fine, and Christopher Volk. (*Id.* ¶¶ 88–89, 390.) At the time relevant to this action, Dr. O'Meara was the acting President of Medical Staff at Banner Baywood Medical Center ("BBMC"), Ms. Dinner was Banner's Senior Associate General Counsel, Dr. Lyons was Co-Executive Vice President of Southwest Diagnostic Imaging, Dr. O'Connor was BBMC's Chief Medical Officer, Mr. Fine was Banner's Chief Executive Officer, and Mr. Volk was a member of Banner's governing board. (*Id.* ¶¶ 6, 8, 13, 15, 17–18.)

The FAC's allegations date back to 2009. At that time, Dr. Maxfield was the head of Banner's Interventional Radiology Department and is alleged to have referred a disproportionate number of Dr. Sharifi's cases to peer review.[1] (*Id.* ¶¶ 43, 141, 145.) Larry Spratling, Banner's former Chief Medical Officer, "suspected that Maxfield's criticism was racially motivated." (*Id.* ¶ 44.) Spratling advised Dr. Sharifi to write Dr. Maxfield a letter to raise his concerns about possible abuses of the peer review process. (*Id.*) Dr. Sharifi wrote the letter. (*Id.* ¶ 45.) The "unwarranted" peer review then ceased. (*Id.*)

Five years later, in November 2014, Dr. Sharifi testified against Banner in a wrongful death action. (*Id.* ¶ 58.) After his testimony, Defendants allegedly "planned and initiated a plot to permanently rid Banner of Dr. Sharifi." (*Id.* ¶ 59.)

The "plot" began in 2015 with claims of sexual harassment, which Dr. O'Meara and Ms. Dinner are alleged to have manufactured. (*Id.* ¶¶ 166–84.) Specifically, Human Resources at BBMC received and investigated staff complaints of sexual harassment against Dr. Sharifi. (*Id.* ¶ 181.) Following the investigation, Dr. O'Meara ordered Dr. Sharifi to stop inviting Banner employees into his office and prohibited him from texting Banner employees or asking for their cellphone numbers. (*Id.* ¶ 182.) Those "draconian prohibitions," the FAC alleges, facilitated Defendants' efforts "to spread lies and misrepresentations about Dr. Sharifi." (*Id.* ¶ 184.)

Also in 2015, a sonographer witnessed a conversation between Dr. O'Meara and

---

[1] Licensed hospitals in Arizona are required to have their physicians organize into committees to review professional practices within the hospital. A.R.S. § 36-445. Such peer review includes "the nature, quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital." *Id.*

Dr. O'Connor relating to Dr. Sharifi.[2] (*Id.*, Ex. C ("Atencio Decl.") at 1.) Dr. O'Connor is alleged to have stated: "Dr. Sharifi is a Muslim Iranian terrorist who kills patients with his venous procedures and must be punished first and then removed from Banner. He testified against Banner in a case at [Banner] Gateway [Medical Center]." (*Id.*) Dr. O'Meara allegedly smiled and replied that he would "pull the trigger." (*Id.*) Dr. O'Meara continued: "Osamas have no place at Banner. . . . Janice [Dinner] will set them up for [the Board of Medical Examiners]." (*Id.*)

Next, in January 2017, Dr. O'Connor allegedly prevented Dr. Sharifi from performing a procedure on a patient at BBMC. (FAC ¶¶ 207–08.) To bypass Dr. O'Connor's authority, Dr. Sharifi performed the procedure at a different Banner facility. (*Id.* ¶ 215.) Dr. Sharifi reported Dr. O'Connor to Banner's Chief Clinical Officer on grounds of patient care concerns and concerns as to Dr. O'Connor's judgment in February 2017. (*Id.* ¶¶ 221–25.)

One month later, the Medical Executive Committee ("MEC") at BBMC initiated a peer review of three cases in which Dr. Sharifi provided medical care. (*Id.* ¶¶ 233–40.) The investigation is alleged to have been initiated by Dr. O'Connor as retaliation for Dr. Sharifi reporting him to Banner's Chief Clinical Officer. (*Id.* ¶¶ 267, 273, 354, 366.) A Cardiology Committee at BBMC completed the peer review and found reckless behavior in two cases. (*Id.* ¶¶ 291–92.) Dr. Sharifi appealed the "reckless" findings, which led to the Cardiology Committee changing the initial scoring "to not 'reckless' in one case and 'entirely dismissed' in another." (*Id.* ¶¶ 293–94.)

While the appeal was pending, the MEC considered the Cardiology Committee's initial findings and deemed further investigation warranted. (*Id.* ¶ 297.) The MEC referred 16 of Dr. Sharifi's cases for external review. (*Id.*) Dr. Sharifi, through counsel, objected to the external reviewer's qualifications. (*Id.* ¶ 304.) But, Ms. Dinner is alleged to have

---

[2] The Court notes that Dr. Sharifi did not expressly include the allegations pertaining to Dr. O'Connor and Dr. O'Meara's conversation in the FAC, itself. Instead, the allegations are included in a declaration attached to the FAC. Because "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes," the Court considers the allegations. Fed. R. Civ. P. 10(c).

"orchestrated" an amendment to the BBMC Medical Staff Bylaws (the "Bylaws"), which changed the "requirements of the external reviewer." (*Id.* ¶¶ 303, 408.)

In June 2017, the MEC examined the results of the external review and imposed corrective action against Dr. Sharifi based on "patient care and record keeping concerns." (*Id.* ¶ 306.) Dr. Sharifi challenged the corrective action and presented a defense to the MEC. (*Id.* ¶ 307.) The MEC—having considered the results of the external review, three expert reports in support of Dr. Sharifi, a rebuttal expert report, portions of Dr. Sharifi's 2009 letter to Dr. Maxfield, and the 2015 sexual harassment investigation—proposed that Dr. Sharifi voluntarily agree to prospective approval and retroactive review of each case he performed. (*Id.* ¶¶ 309, 319, 321–22.) Dr. Sharifi refused. (*Id.* ¶ 326.) The MEC then imposed the restrictions as corrective action. (*Id.* ¶ 338.)

Soon after, an internal medicine physician overheard two conversations relating to Dr. Sharifi. (*Id.* ¶¶ 29–30, 81–85, 373–77, 381–82, Ex. A ("Rose Decl.") ¶¶ 8–17, 23–25.) First, the internist witnessed Dr. O'Meara "become livid" in response to a nurse's request to consult Dr. Sharifi. (FAC ¶ 381.) Dr. O'Meara is alleged to have stated: "Dr. Sharifi has been suspended for killing patients []. He is a terrible doctor and nobody should refer to him anymore. I have reported him to the [Board of Medical Examiners]." (Rose Decl. ¶ 23.) Dr. O'Meara continued:

> This f…ing Iranian has taken the whole damn referrals. Just look. I've suspended him and he is still getting referrals on our patients. Unbelievable. In this day and age that Muslims are hiding, he has rejected the stipulation agreement of the Hospital. Dinner and the whole Board are going to teach him a lesson that he won't forget.

(*Id.* ¶ 25.)

Second, the internist overheard a conversation between Dr. Hu, Dr. Lyons, and Dr. Maxfield in September or October of 2017. (FAC ¶¶ 30, 81–83, 373–78; Rose Decl. ¶¶ 3, 8–17.) During the conversation, Dr. Hu allegedly stated he was "nervous about making [] false allegations against Sharifi." (Rose Decl. ¶ 8.) Dr. Maxfield is alleged to

have encouraged Dr. Hu to "F… this F…ing Iranian." (*Id.* ¶ 17.) Dr. Maxfield further stated Dr. Sharifi had "cut[] into [their] business" and "taken away [their] DVT practice." (*Id.* ¶¶ 9, 17.) In addition, the FAC indicates that "Maxfield, Hu, and Lyons . . . were upset that Dr. Sharifi was the only practitioner with [interventional radiology] privileges at BBMC who directly competed with them." (FAC ¶ 143.)

In November 2017, Dr. Sharifi requested a Fair Hearing to challenge the MEC's corrective action. (*Id.* ¶¶ 339–40.) During a prehearing conference, Dr. Sharifi and counsel for the MEC acknowledged a flaw in the Bylaws, which prevented a hearing committee from being selected. (*Id.* ¶ 340.) Dr. Sharifi proposed that the parties appoint the hearing committee by mutual agreement. (*Id.* ¶ 344.) Instead, BBMC amended the Bylaws and removed the flawed provision. (*Id.* ¶ 347.) The hearing committee was subsequently appointed. (*Id.* ¶¶ 349–50.) Ms. Dinner is alleged to have appointed "her good friend" as the hearing officer to "sway" the hearing panel. (*Id.*)

In September 2018, the Fair Hearing occurred.[3] (*Id.*, Ex. D ("Baker Decl.") ¶ 4.) Dr. Hu is alleged to have stood outside the hearing to "trash Dr. Sharifi" and "intimidate any witnesses or others who came to support him." (FAC ¶ 333.) One individual, whose father was treated by Dr. Sharifi, intended to testify on Dr. Sharifi's behalf. (*Id.* ¶ 334.) But, after hearing Dr. Hu "rant about Dr. Sharifi killing and paralyzing his patients," she abandoned her plan to testify. (*Id.* ¶¶ 335–36; Baker Decl. ¶¶ 9–11, 14.)

After the Fair Hearing, in November or December 2018, a sonographer overheard Ms. Dinner having a conversation in the atrium of BBMC. (*Id.* ¶¶ 384–86, Ex. B ("Wilson Decl.") ¶¶ 3, 10–20.) While talking on a cellphone, Ms. Dinner allegedly described Dr. Sharifi as a "terrible doctor" who "kills patients" and is "a danger to the patients in

---

[3] Defendants suggest the hearing panel recommended that Dr. Sharifi's PSAs be revoked. (Doc. 53 at 4.) The Motions further indicate that Dr. Sharifi appealed the hearing panel decision to Banner's Appellate Review Committee, and after "considering the written record, briefs and oral argument from Sharifi," the Appellate Review Committee also recommended revocation. (*Id.*) Defendants say the Banner Board of Directors then accepted those recommendations and revoked Dr. Sharifi's PSAs. (*Id.*) This procedural history is not expressly referenced in the FAC. Indeed, the FAC alleges relatively few facts pertaining to what occurred procedurally between the Bylaw amendment in February 2018 and Banner's decision to revoke Dr. Sharifi's PSAs in December 2018. (FAC ¶¶ 348–52.)

Arizona." (Wilson Decl. ¶¶ 10–12.) She continued: "[t]his has gone beyond ridiculous. I know that you, Peter [Fine] and Chris [Volk] want him fired at all costs." (*Id.* ¶ 14.) Ms. Dinner then referred to Dr. Sharifi as "[t]he idiot Muslim Iranian" who "dared to sue [her] and report [her] to the Bar" and is alleged to have stated that she "will make his life a living hell." (*Id.* ¶ 15.) Ms. Dinner referenced other attempts to "get [Dr. Sharifi] on drug or alcohol use." (*Id.* ¶ 17.) And she further is alleged to have stated: "Payback time. . . . Peter [Fine] wants to make him an example so nobody dares testify against [Banner]." (*Id.* ¶¶ 18–19.)

On December 12, 2018, Dr. Sharifi received a letter from BBMC's Chief Executive Officer, notifying him that his PSAs had been revoked and his clinical privileges terminated. (FAC ¶¶ 351–52.) Dr. Sharifi exercised his statutory right of appeal. (*Id.* ¶ 427.) *See* A.R.S. § 36-445.02(B). An Arizona state court found that Banner's alleged reasons for revoking Dr. Sharifi's PSA—that is, patient care issues, alteration of medical records, and disruptive behavior—were each supported by substantial evidence. (Doc. 35–1 at 7–8.) *See Sharifi Takieh v. Banner Health*, No. CV 2017-055848 (Ariz. Super. Ct. Sept. 13, 2019).[4] The state court further determined that: (1) the enforcement of hearing time limits was reasonable and did not violate Dr. Sharifi's procedural rights; (2) amendments of the Bylaws and application of the amended Bylaws were not arbitrary, capricious, or unlawful; (3) Dr. Sharifi did not prove actual harm based on the Bylaw amendments; (4) application of the amended Bylaws did not deprive Dr. Sharifi of due process; and (5) the other procedural issues raised by Dr. Sharifi did not support injunctive relief. (*Id.* at 5–14.) Dr. Sharifi appealed the state court decision. (FAC ¶ 428.) His appeal remains pending.

In December 2019, Dr. Sharifi initiated this lawsuit, asserting claims for relief under 42 U.S.C. § 1981. (Doc. 1.) Considering the Supreme Court's opinion in *Comcast Corp. v. National Association of African American-Owned Media, Inc.*, --- U.S. ---, 140 S. Ct. 1009 (2020), which imposed a more demanding causation standard, this Court dismissed the

---

[4] As explained in detail in Part III.A.2, *infra*, the Court will take judicial notice of the Under Advisement Ruling in *Sharifi Takieh v. Banner Health*, No. CV 2017-055848 (Ariz. Super. Ct. Sept. 13, 2019). (Doc. 35–1.)

Complaint but granted leave to amend. (Doc. 49.) Dr. Sharifi timely filed the FAC. Defendants now move to dismiss the FAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 53–55.)

## II.   LEGAL STANDARD

A complaint must allege a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A complaint should only be dismissed if it fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In deciding a Rule 12(b)(6) motion, the Court must construe all allegations of material fact in the light most favorable to the nonmoving party. *Marcus v. Holder*, 574 F.3d 1182, 1184 (9th Cir. 2009). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

Unless the Court converts a Rule 12(b)(6) motion into a motion for summary judgment, the Court may consider only the complaint, exhibits properly submitted as part thereof, and matters that may be judicially noticed. *See* Fed. R. Civ. P. 12(d); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). The Court may take judicial notice of facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

## III.   DISCUSSION

Section 1981 offers relief when racial discrimination impairs a contractual relationship. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). To plausibly

1    allege a § 1981 claim, a plaintiff "must show intentional discrimination on account of race."

2    *Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989). In addition, "a plaintiff must initially

3    plead and ultimately prove that, but for race, it would not have suffered the loss of a legally

4    protected right." *Comcast Corp.*, 140 S. Ct. at 1019.

5          The contractual relationship here is Dr. Sharifi's PSA with Banner. Defendants

6    argue the FAC does not adequately plead that Dr. Sharifi's race was the but-for cause of

7    his PSAs being revoked. (Doc. 53 at 2; Doc. 54 at 2;[5] Doc. 55 at 6–7.) Ms. Dinner,

8    Mr. Fine, Mr. Volk, Dr. O'Connor, Dr. Lyons, Dr. Hu, and Dr. Maxfield further contend

9    the FAC fails to allege a plausible § 1981 claim against each of them as individuals.

10   (Doc. 54 at 3–9; Doc. 55 at 7–9.) The Court addresses each argument in turn.

11         **A.    Causation**

12         "Few legal principles are better established than the rule requiring a plaintiff to

13   establish causation." *Comcast Corp.*, 140 S. Ct. at 1013. Until recently, a plaintiff within

14   the Ninth Circuit could assert a plausible § 1981 claim by showing that his or her race was

15   a motivating factor for an alleged contractual impairment. *See Nat'l Ass'n of Afr. Am.-*

16   *Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 626 (9th Cir. 2019), *rev'd*, 140

17   S. Ct. 1009 (2020). Now—as made clear by the Supreme Court—Dr. Sharifi must "initially

18   plead . . . that, but for [his] race, [he] would not have suffered the loss of a legally protected

19   right." *Comcast Corp.*, 140 S. Ct. at 1019.

20         Defendants argue Dr. Sharifi has not plausibly alleged that his race was the but-for

21   cause of Banner revoking his PSAs. (Doc. 53 at 2; Doc. 54 at 2; Doc. 55 at 6–7.) First,

22   Defendants contend the FAC identifies non-discriminatory reasons for Defendants'

23   actions. (Doc. 53 at 2; Doc. 55 at 10–11.) Second, Defendants argue the FAC's allegations

24

25   ---

     [5] In their Motion, Dr. O'Connor, Ms. Dinner, Mr. Fine, and Mr. Volk state that "[t]he
     claims against [them] fail for the . . . additional reasons set out in the Motion to Dismiss

26   filed by Banner" and thereby attempt to "incorporate by reference" sections of Banner's
     Motion. (Doc. 54 at 2.) Although Rule 10(c) of the Federal Rules of Civil Procedure allows

27   statements in *pleadings* to be adopted by reference in any other pleading or motion, that
     rule does not apply to arguments in *motions* being incorporated by reference into new

28   motions. The Court generally disfavors a single firm filing multiple motions to dismiss in
     the same case. Nonetheless, the Court, in its discretion, will consider the arguments raised
     in Banner's Motion as applied Dr. O'Connor, Ms. Dinner, Mr. Fine, and Mr. Volk.

1  of causation rely on issues that have been resolved against Dr. Sharifi in previous litigation.

2  (Doc. 53 at 11–17; Doc. 55 at 12–14.)

3  **1.  Non-Discriminatory Reasons in the FAC**

4  Defendants argue Dr. Sharifi's § 1981 claims are implausible because the FAC

5  alleges race-neutral reasons for the revocation of his PSAs. (Doc. 53 at 2; Doc. 55 at 10–

6  11.) The Court agrees.

7  If a "complaint identifies independent non-discriminatory reasons for [an] alleged

8  [contractual] impairment," a § 1981 claim is rendered implausible. *Astre v. McQuaid*, 804

9  F. App'x 665, 667 (9th Cir. 2020) (quoting *FCS Advisors, LLC v. Missouri*, 929 F.3d 618,

10  622 (8th Cir. 2019)). For example, in *Astre*, a plaintiff bringing claims under § 1981

11  expressly alleged that she resigned from her job after her employer lost funding due to a

12  lack of community support. *Id.* at 666–67; *see Astre v. McQuaid*, No. 3:18-CV-00138-

13  WHO, 2018 WL 5617226, at *3 (N.D. Cal. Oct. 26, 2018). Considering that race-neutral

14  explanation, the Ninth Circuit determined that the plaintiff's other allegations did "not give

15  rise to a plausible inference that [a defendant's] alleged racially discriminatory actions

16  caused [an] alleged impairment to [the plaintiff's] contractual relationship." *Astre*, 804

17  F. App'x at 667. The Ninth Circuit thereby concluded the plaintiff's § 1981 claims were

18  implausible and affirmed the lower court's dismissal of the claims with prejudice. *Id.*

19  at 667–68.

20  Similarly, in *Domino v. Kentucky Fried Chicken*, No. 19-CV-08449-HSG, 2020

21  WL 5847306 (N.D. Cal. Oct. 1, 2020), the court concluded that the plaintiff failed to state

22  a § 1981 claim because the plaintiff did not adequately plead that racial animus was the

23  but-for cause of an alleged contractual impairment. *Id.* at *2. The plaintiff alleged that a

24  defendant-restaurant's employees repeatedly used racial slurs and treated a patron of a

25  different race more favorably under similar circumstances. *Id.* But, the plaintiff also alleged

26  that the defendant's employees identified him as someone who had previously complained

27  about the quality of the restaurant's food and as someone who entered the restaurant on a

28  prior occasion without making a purchase. *Id.* at *1–2. Thus, because the plaintiff alleged

that "the employees were also motivated by previous, personal interactions with [the] [p]laintiff," the court dismissed the plaintiff's § 1981 claim. *Id.* at *2.

Here, Dr. Sharifi's claims are implausible because the FAC identifies four independent, non-discriminatory reasons for the alleged impairments to his PSAs. First, Dr. Sharifi alleges Banner revoked his PSAs, at least in part, because he testified against Banner in a wrongful death case. (FAC ¶¶ 80, 148, 161, 202, 328, 354.) Indeed, the FAC expressly alleges that Mr. Fine "want[ed] to make him an example so nobody dares testify against [Banner]." (Wilson Decl. ¶ 19.) The FAC further indicates that Dr. Sharifi's "testimony coincided with the commencement of" the sexual assault investigation. (FAC ¶ 161.) "[I]n some circumstances the requisite causal link may be inferred from temporal proximity." *Bleeker v. Vilsack*, 468 F. App'x 731, 732 (9th Cir. 2012) (citing *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000)). But if the Court draws any inference from that factual allegation, the inference suggests that Dr. Sharifi's testimony—not his race—caused the alleged impairments to his contractual relationship with Banner.

Second, the FAC indicates Dr. O'Meara, Dr. Hu, Dr. Maxfield, and Dr. Lyons were motivated by professional jealousy and competition. The FAC alleges that Dr. Hu, Dr. Maxfield, and Dr. Lyons were formerly affiliated with EVDI Medical Imaging. (FAC ¶ 143.) Dr. Sharifi contends his "practice always competed with EVDI," and "EVDI physicians always opposed him." (*Id.* ¶ 135.) The FAC further alleges that "Maxfield, Hu, and Lyons . . . were upset that Dr. Sharifi was the only practitioner with [interventional radiology] privileges at BBMC who directly competed with them." (*Id.* ¶ 143.) And the FAC suggests Dr. O'Meara was motivated, at least in part, because Dr. Sharifi was "getting referrals on [his] patients." (Rose Decl. ¶ 25.)

Third, Dr. O'Connor is alleged to have initiated the MEC's peer review process because Dr. Sharifi reported him to Banner's Chief Clinical Officer. (FAC ¶¶ 273, 354, 366–67.) The FAC expressly states Dr. Sharifi "was not selected for peer review until March 2017, after retaliatory measures by O'Connor." (*Id.* ¶ 267.) Last, Dr. Sharifi alleges Ms. Dinner "vowed to make his life a living hell" because he previously "sue[d] her" and

reported her to the State Bar. (*Id.* ¶ 386; Wilson Decl. ¶ 15.)

The reasonable inference to be drawn from these allegations is that Defendants were motivated, in part, by their previous encounters with Dr. Sharifi, not his race. *See Domino*, 2020 WL 5847306 at *2. The allegations therefore do not give rise to a plausible inference that racial animus was the but-for cause of Banner's decision to revoke Dr. Sharifi's PSAs. *See Astre*, 804 F. App'x at 667. Thus, because Dr. Sharifi fails to plead that but for his race, he would not have suffered the loss of a legally protected right, the Court finds Dr. Sharifi's § 1981 claims implausible. *See Comcast Corp.*, 140 S. Ct. at 1019.

### 2.      Collateral Estoppel

Defendants contend that Dr. Sharifi "is collaterally estopped from contesting the grounds articulated by Banner for [his] termination or re-litigating procedural challenges" to the peer review process. (Doc. 53 at 12.) Thus, Defendants say, Dr. Sharifi cannot demonstrate that his race was the but-for cause of his termination. (Doc. 55 at 6–7.)

Arizona law requires peer review in all licensed hospitals and outpatient surgical centers. A.R.S. § 36-445. The statutory purpose of peer review is to reduce morbidity and mortality and improve patient care in Arizona. *Id.* If, as a result of peer review, a physician's privileges are revoked, the physician has the right to pursue "an action for injunctive relief seeking to correct an erroneous decision or procedure." A.R.S. § 36-445.02(B). The state court's evaluation is "limited to a review of the record." *Id.* "If the record shows that the . . . revocation . . . of membership or privileges is supported by substantial evidence, no injunction shall issue." *Id.*

Before initiating this action, Dr. Sharifi challenged Banner's decision to revoke his PSAs by seeking injunctive relief pursuant to A.R.S. § 36-445.02(B). (FAC ¶ 427.) Defendants request that the Court take judicial notice of the state court's ruling resolving Dr. Sharifi's § 36-445.02 appeal. (Doc. 53 at 17–18; Doc. 55 at 2.) As a threshold matter, the Court will take judicial notice of the Under Advisement Ruling entered on September 13, 2019 by Arizona Superior Court Judge Lisa Flores in *Sharifi Takieh v. Banner Health*, No. CV 2017-055848 (the "Ruling"). (Doc. 35–1.) *Lee*, 250 F.3d at 689 ("A court may

take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment."); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of pleadings filed in a related state court action).

In the Ruling, the state court determined substantial evidence supported Banner's decision to revoke Dr. Sharifi's PSAs on grounds of patient care issues, Dr. Sharifi's alteration of medical records, and his disruptive behavior. *Sharifi Takieh*, No. CV 2017-055848 at 6–7. The state court further found no error as to the imposed hearing time limits, the amendments of the Bylaws, the application of the Bylaws, and various other alleged procedural violations. *Id.* at 4–6, 8–13.

Defendants argue that the Ruling is entitled to preclusive effect in this matter. (Doc. 53 at 12–18; Doc. 55 at 12–15.) Dr. Sharifi challenges the application of preclusion principles on multiple grounds. The Court will address each of Dr. Sharifi's arguments.

### a. Application to Peer Review Decisions

Dr. Sharifi first argues "there is no legal support for the proposition that issues decided by Banner's peer review committees, hearing panels, or any other decision-making body are entitled to preclusive effect." (Doc. 59 at 10.) "Issue preclusion, or collateral estoppel, precludes relitigation of an issue already litigated and determined in a previous proceeding between the same parties." *Pike v. Hester*, 891 F.3d 1131, 1138 (9th Cir. 2018). The Court is required to "give state court judgments the preclusive effect that those judgments would enjoy under the law of the state in which the judgment was rendered." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001). Similarly, the Court must give a decision of a state administrative agency acting in a judicial capacity "the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796, 799 (1986). Here, an Arizona court rendered the Ruling, and thus this Court must apply Arizona law.

Arizona generally endorses a "broad" and "expansive application of preclusion principles." *Hawkins v. Dep't of Econ. Sec.*, 183 Ariz. 100, 104 (App. 1995). Issue

preclusion is appropriate when:

> [T]he issue or fact to be litigated was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it, provided such issue or fact was essential to the prior judgment.

*Bridgestone/Firestone N. Am. Tire, L.L.C. v. Naranjo*, 206 Ariz. 447, 452 (App. 2003) (internal quotations omitted). If those elements are established, "Arizona permits a new defendant in a subsequent case to use the doctrine defensively to preclude relitigation of an issue." *Id.*; *see King v. Superior Court*, 138 Ariz. 147, 151 (1983). An appeal from a judgment does not suspend the application of collateral estoppel. *Ariz. Downs v. Superior Court*, 128 Ariz. 73, 76 (1981).

In this case, Banner revoked Dr. Sharifi's PSAs while fulfilling its peer-review obligations under A.R.S. § 36-445. A state court affirmed Banner's decision pursuant to A.R.S. § 36-445.02(B). The parties have not cited, and the Court is unaware of, any case in which an Arizona court has squarely addressed whether issue preclusion is applicable to decisions made pursuant to A.R.S. § 36-445, et seq. The Court therefore must determine whether Banner's decision, affirmed on statutory appeal, is eligible for preclusive effect.

Defendants make two arguments in favor of applying preclusion principles. First, Defendants contend Banner's peer review decision and subsequent judicial review is akin to an administrative decision, affirmed on appeal. (Doc. 66 at 6–8.) Second, Defendants argue that under *Caldeira v. County of Kauai*, 866 F.2d 1175 (9th Cir. 1989), the Ruling itself is a judicial proceeding entitled to preclusive effect. (Doc. 68 at 4–5.)

### i.       Akin to an Administrative Agency

Arizona courts give "decisions of administrative agencies acting in quasi-judicial capacity" preclusive effect.[6] *Hawkins*, 183 Ariz. at 103. Defendants argue Banner's Fair Hearing process is an adjudicatory proceeding, akin to an administrative decision, affirmed on appeal. (Doc. 66 at 6–8.) Dr. Sharifi argues "there is no support for the proposition that

---

[6] The Court notes that the Ruling characterizes peer review as an "administrative proceeding." *Sharifi Takieh*, No. CV 2017-055848 at 3.

[Banner's] Fair Hearing decision (or any subsequent Banner appeal procedure) is equivalent to a decision of an administrative agency acting in quasi-judicial capacity." (Doc. 59 at 10.) Dr. Sharifi contends that this case is analogous to *Falcone Brothers & Associates, Inc. v. City of Tucson*, 240 Ariz. 482 (App. 2016), such that the application of issue preclusion would be improper. (Doc. 59 at 13.) The Court agrees with Defendants.

In *Falcone Brothers*, the Arizona Court of Appeals declined to give a decision rendered by a city's director of procurement preclusive effect. 240 Ariz. at 491–92. The appellate court based its holding on three grounds. First, the city lacked legal authority for its administrative scheme because the city was not authorized by statute to conduct non-judicial review. *Id.* at 491. Second, the city's procurement code "lack[ed] a statutory right of judicial review." *Id.* at 492. Last, the procurement director's decision was not made "after a full and fair opportunity to litigate the issue" because the city adjudicated its own dispute. *Id.*

The present matter is distinguishable from *Falcone Brothers* for two reasons. First, Arizona hospitals are required by statute to create peer review committees to pursue a function established by statutory policy. *See* A.R.S. § 36-445. Thus, unlike the procurement director in *Falcone Brothers*, Banner's peer review committee is authorized by statute to conduct non-judicial review in the first instance. *Id.*

A second, yet related, distinguishing characteristic is that decisions rendered pursuant to A.R.S. § 36-445 are subject to judicial review. *See* A.R.S. § 36-445.02(B). Consequently, a physician, like Dr. Sharifi, whose privileges are revoked as a result of peer review may challenge the fairness of the decisional process by way of his or her statutory right of appeal. *Id.*

The current matter and *Falcone Brothers* do share a similar trait. Like the city in *Falcone Brothers*, Banner adjudicated a dispute arising from one of its own contracts. This similarity, however, does not prevent Banner's decision from being entitled to preclusive effect. Comparing *Hurst v. Bisbee Unified School District No. Two*, 125 Ariz. 72 (App. 1979) to *Falcone Brothers* reveals why.

In *Hurst*, the Arizona Court of Appeals gave preclusive effect to a decision rendered by a school district's governing board. 125 Ariz. at 75. The governing board terminated a plaintiff-teacher's employment contract. *Id.* at 73. Exercising her statutory rights, the teacher demanded a hearing before a dismissal commission to challenge the board's decision. *Id.* After the hearing, the commission submitted a report to the board. *Id.* The board then voted that the teacher be dismissed. *Id.* In finding the board's decision to be *res judicata*,[7] the appellate court noted that the governing board's authority to dismiss the teacher was authorized by statute, and a teacher, like the plaintiff, could appeal the governing board's decision to a court of competent jurisdiction. *Id.* at 73, 75–76 (quoting A.R.S. §§ 15-252, -253, -264).

In *Falcone Brothers*, the Arizona Court of Appeals considered and distinguished the facts in *Hurst*. Specifically, the appellate court noted that "[i]mplicit in [*Hurst*] are the dual premises that an aggrieved teacher could challenge, by way of her statutory right of appeal, a governing board's decision . . . and that this process provided the teacher a full and fair opportunity to litigate any claims concerning due process or bias." *Falcone Bros. & Assocs., Inc.*, 240 Ariz. at 492. The same is true here. Dr. Sharifi possessed and exercised his statutory right to seek judicial review of Banner's decision to revoke his PSAs. Thus, although Banner did adjudicate its own contract with Dr. Sharifi, there are safeguards to ensure Dr. Sharifi was provided adequate due process. The Court therefore finds this case to be more like *Hurst* than *Falcone Brothers*. That finding weighs in favor of Banner's decision, affirmed on appeal, being entitled to preclusive effect.

Furthermore, "[a]n adjudicative determination by an administrative tribunal is entitled to the same res judicata effect as a judgment of a court if it 'entail[s] the essential elements of adjudication.'" *A. Miner Contracting, Inc.*, 233 Ariz. at 255 (footnote omitted) (quoting Restatement (Second) of Judgments ("Restatement") § 83(2) (1982)). Those elements include:

---

[7] The Court notes that, "[a]lthough subject to evolving meanings, the term 'res judicata' may encompass both claim preclusion and the related concept of issue preclusion." *A. Miner Contracting, Inc. v. Toho-Tolani Cnty. Improvement Dist.*, 233 Ariz. 249, 255 n.10 (App. 2013).

(a) Adequate notice to persons who are to be bound by the adjudication . . .;

(b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut evidence and argument by opposing parties;

(c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;

(d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and

(e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question . . . .

*Id.* (quoting Restatement § 83(2)).

Banner's peer review process entails the essential elements of adjudication. First, Dr. O'Meara informed Dr. Sharifi in March 2017 that he was the subject of peer review and directed Dr. Sharifi to appear before the peer review committee. (FAC ¶¶ 233, 235.) Second, Dr. Sharifi had the opportunity to present evidence and legal argument in support of his position and rebut evidence and argument by Banner. For example, Dr. Sharifi offered three reports by "internationally renowned experts in his field" to rebut Banner's internal review. (*Id.* ¶ 309.) Third, the decision rendered by Banner resolves a matter analogous to a "legal claim" in judicial adjudication. That is, whether Dr. Sharifi's patient care or behavior justified the suspension or revocation of his PSAs. Fourth, the Chief Executive Officer of BBMC provided Dr. Sharifi written notice that his PSAs had been "unilaterally revoked and that he no longer had privileges." (*Id.* ¶¶ 351–52.) Fifth, additional procedural rights, like judicial review, are granted to physicians as part of the peer review process. *See* Restatement § 83 cmt. c ("The fact that an agency adjudication was subjected to judicial review and was upheld is a factor that supports giving it preclusive

effect.").

In his Response, Dr. Sharifi correctly notes that the state court "was statutorily limited to a review of the 'record' of the Fair Hearing." (Doc. 59 at 11.) *See* A.R.S. § 36-445.02(B) (stating judicial review "shall be limited to a review of the record. If the record shows that the denial, revocation, limitation or suspension of membership or privileges is supported by substantial evidence, no injunction shall issue"). Dr. Sharifi thereby argues that the state court's "token review" does not entitle Banner's decision to preclusive effect. (Doc. 59 at 16.) The Court disagrees.

When an Arizona court reviews an administrative decision, the court must presume the validity of the agency's action "unless it is against the weight of the evidence, unreasonable, erroneous, or illegal as a matter of law." *Pawn 1st, LLC v. City of Phoenix*, 242 Ariz. 547, 551 (2017) (internal quotations omitted); *see also* A.R.S. § 12-910(E) ("The court shall affirm the agency action unless the court concludes that the agency's action is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion."). The standard of review prescribed in A.R.S. § 36-445.02(B) therefore mirrors the standard Arizona courts must apply when reviewing administrative decisions. Despite the deferential standard of judicial review, Arizona courts may give "decisions of administrative agencies acting in quasi-judicial capacity" preclusive effect. *Hawkins*, 183 Ariz. at 103. Thus, the deferential standard required under A.R.S. § 36-445.02(B) offers no support for Dr. Sharifi's arguments opposing preclusion.

Finally, Arizona caselaw discussing the purpose and efficacy of peer review guides the Court. "Arizona public policy calls for the intervention by hospital and medical staffs between physicians and patients in the interest of sound patient care." *Scappatura v. Baptist Hosp. of Phx.*, 120 Ariz. 204, 209 (App. 1978), *superseded by statute*, A.R.S. § 36-445.02. Arizona courts recognize that peer review "is not only time consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity." *Goodman v. Samaritan Health Sys.*, 195 Ariz. 502, 509 (App. 1999) (internal quotations omitted). Thus, "[i]f lawsuits by unhappy reviewees can easily follow any decision then the peer reviewed

demanded by A.R.S. § 36-445 will become an empty formality, if undertaken at all." *Id.* Considering the purposes of peer review and the externalities militating against its efficacy, the Court finds the application of preclusion principles to peer review decisions consistent with Arizona policy.

Considering the foregoing, the Court finds Banner's peer review process akin to an administrative agency acting in quasi-judicial capacity. Thus, Banner's decision, affirmed on statutory appeal, is eligible for preclusive effect. *See Hawkins*, 183 Ariz. at 103.

### ii.   Judicial Proceeding

Defendants further argue the Ruling itself is a judicial proceeding entitled to preclusive effect. (Doc. 68 at 4–5.) The Court agrees that this feature provides a separate, independent basis for applying principles of issue preclusion.

In *Caldeira v. County of Kauai*, the Ninth Circuit considered whether a judicially reviewed arbitration decision should be given preclusive effect by a federal court. 866 F.2d at 1177–78. The Ninth Circuit explained that "it has consistently held that an *unreviewed* arbitration decision does not preclude a federal court action." *Id.* at 1178. But because the case involved a judicially reviewed arbitration decision, the Ninth Circuit determined "the plain language of section 1738 controls . . . . The state court's confirmation of the arbitration award constitutes a judicial proceeding for purposes of section 1738, and thus must be given the full faith and credit it would receive under state law." *Id.* As noted, an Arizona court rendered the Ruling. Thus, this Court must determine the full faith and credit the Ruling would receive under Arizona law.

The Arizona Court of Appeals has given a judicially confirmed arbitration decision preclusive effect. *See Norton v. Phonejockey LLC*, No. 1 CA-CV 15-0186, 2016 WL 5939723, at *2–3 (Ariz. App. Oct. 13, 2016). In reaching that conclusion, the appellate court determined that an underlying arbitration proceeding must satisfy the elements of adjudicatory procedure for issue preclusion to apply. *Id.* at *3.

The Court is mindful of the differences between arbitration and Banner's peer review process, perhaps the most prominent being that a dispute subject to arbitration is

resolved by a third-party neutral. Notwithstanding that difference, the Court finds the appellate court's decision in *Norton* instructive. As discussed, Banner's peer review process incorporates the essential elements of adjudication. *See supra* Part III.A.2.a.i. Moreover, because peer review decisions are subject to judicial review, an aggrieved physician can contest the fairness of the system. Thus, the Court finds Banner's peer review process sufficiently similar to a judicial proceeding to permit the application of issue preclusion.

Accordingly, regardless of whether an Arizona court would construe Banner's decision, affirmed on appeal, as akin to an administrative agency acting in quasi-judicial capacity or, alternatively, as a judicial proceeding, Arizona law supports the application of preclusion principles.

### b.     Arizona Preclusion Exceptions

Dr. Sharifi next argues that issue preclusion has "no application in the context of racial discrimination claims." (Doc. 59 at 14–15.) The Court disagrees. In *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), the Supreme Court considered whether applying a rule of preclusion is appropriate in adjudicating claims arising under Title VII and claims arising under Reconstruction-era civil rights statutes, like § 1981. *Id.* at 791 n.1, 795. The Supreme Court concluded that "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." *Id.* at 796. Title VII requires the Equal Employment Opportunity Commission to "accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law." 42 U.S.C. § 2000e-5(b). The Supreme Court declared "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court." *Elliott*, 478 U.S. at 795.

Notably, the Supreme Court reached a different conclusion as to claims arising under Reconstruction-era civil rights statutes. *Id.* at 796–97. That is, the Supreme Court held that preclusion principles do apply in the adjudication of Reconstruction-era civil rights statutes, including § 1981. *Id.* at 791 n.1, 796–99. The Supreme Court explained that

"Congress, in enacting the Reconstruction civil rights statutes, did not intend to create an exception to general rules of preclusion," and further stated it saw "no reason to suppose that Congress . . . wished to foreclose the adaptation of traditional principles of preclusion." *Id.* at 796–97. Thus, although a rule of preclusion is inconsistent with the intent and purpose of Title VII claims, the same is not true with respect to claims arising under § 1981.

Similarly, under Arizona law, "[t]he judicial efficiency which can be obtained through application of principles of issue preclusion must give way where their rigid application would result in frustration of legislative purpose." *Ferris v. Hawkins*, 135 Ariz. 329, 333 (App. 1983). For example, and consistent with *Elliott*, the Arizona Court of Appeals has held that principles of preclusion do not apply to claims brought under the Arizona Civil Rights Act ("ACRA"), a statutory scheme modeled after Title VII. *Hawkins*, 183 Ariz. at 104. In reaching its conclusion, the appellate court determined that "a common-law rule of preclusion would be inconsistent with the underlying intent and purpose of the ACRA." *Id.*

The Arizona Court of Appeals carved out a second exception to Arizona's otherwise expansive application of preclusion in *Ferris*. In that case, the appellate court declined to give a judgment entered in an unemployment compensation appeal preclusive effect in a related appeal from a decision of the Arizona State Personnel Board. *Ferris*, 135 Ariz. at 330. The court concluded that the application of "principles of issue preclusion under [those] circumstances would defeat the intent of the legislature and the salutary purposes underlying the unemployment compensation statutes as well as the purpose behind the creation of the Personnel Board." *Id.* at 332.

Considering the foregoing, the application of preclusion principles to § 1981 claims does not present the same concerns the Arizona Court of Appeals confronted in *Hawkins* and *Ferris*. Because Dr. Sharifi only alleges claims under § 1981, and not claims under Title VII, *Hawkins* does not apply to this case. *See Quade v. Ariz. Bd. of Regents*, No. CV-15-00610-PHX-JAT, 2015 WL 10939902, at *3–4 (D. Ariz. Sept. 14, 2015) (holding the preclusion exception in *Hawkins* did not apply to a plaintiff's claim under § 1983, another

1  Reconstruction-era civil rights statute). *Ferris* is similarly inapposite given that the present

2  case concerns neither a decision by Arizona's State Personnel Board nor Arizona's

3  unemployment compensation statutes. Accordingly, because applying a rule of preclusion

4  is appropriate with respect to § 1981 claims, the Court will determine whether the elements

5  of issue preclusion are met.

6  ### c.    Elements of Issue Preclusion

7  Under Arizona law, issue preclusion bars a party from relitigating an issue resolved

8  in a prior lawsuit if: (1) the issue or fact was "actually litigated;" (2) "a final judgment was

9  entered;" (3) "the party against whom the doctrine is to be invoked had a full opportunity

10  to litigate the matter and actually did litigate it;" and (4) the "issue or fact was essential to

11  the prior judgment." *Bridgestone/Firestone N. Am. Tire, L.L.C.*, 206 Ariz. at 452.

12  As to finality, Arizona courts follow the principles set forth in the Restatement. *See*

13  *Campbell v. SZL Props., Ltd.*, 204 Ariz. 221, 224 (App. 2003). The Restatement provides

14  that, for purposes of issue preclusion, a final judgment "includes any prior adjudication of

15  an issue in another action that is determined to be sufficiently firm to be accorded

16  conclusive effect." Restatement § 13; *see also Campbell*, 204 Ariz. at 224. "[T]hat the

17  parties were fully heard, that the court supported its decision with a reasoned opinion, that

18  the decision was subject to appeal or was in fact reviewed on appeal," suggest a decision

19  is final. Restatement § 13 cmt. g; *see Matter of Lockard*, 884 F.2d 1171, 1175 (9th

20  Cir. 1989) (applying Arizona law).

21  Here, the factual issues resolved in the Ruling are entitled to preclusive effect.[8] The

22  Ruling is a final judgment. The Ruling states that "[j]udicial review of Banner Health's

23  final decision revoking Dr. Sharifi's membership and privileges is complete." *Sharifi*

24  *Takieh*, No. CV 2017-055848 at 13. As part of the judicial review process, the state court:

25          reviewed the entire record from the administrative proceeding
        below, including but not limited to the parties' pre-hearing
26          position statements, the transcribed record of the hearing, the
        exhibits that were offered to the Hearing Panel, the proposed
27

28  ---
   [8] Because Defendants' preclusion arguments focus on the factual issues resolved by the state court, the Court centers its analysis on the preclusive effect of the Ruling.

> findings submitted by both parties, the Hearing Panel's findings and recommendations, the MEC's notice of final recommendation, Dr. Sharifi's request for appellate review, both parties' briefs submitted to the Banner Appellate Review Committee, the written recommendation of the Banner Appellate Review Committee, the Governing Board's final action, and the parties' briefs filed in the superior court action. The Court also considered the oral arguments of counsel.

*Id.* at 3. The state court considered and resolved each issue raised by Dr. Sharifi. *Id.* at 4–13. And Dr. Sharifi has since appealed the decision. (FAC ¶ 428.). As the state court's recounting of the various stages of the peer review process and the Ruling itself suggest, Dr. Sharifi had a full and fair opportunity to litigate, and did litigate, the factual issues resolved by the state court. Those factual issues were central to the Ruling, and thereby essential to the judgment. Accordingly, the Court finds that the doctrine of issue preclusion bars Dr. Sharifi from relitigating the factual issues resolved by the state court.

Dr. Sharifi argues that he has not had a "full and fair opportunity to litigate whether racial discrimination was the 'but for' cause of the termination of his privileges." (Doc. 59 at 13–14.) Before evaluating Dr. Sharifi's argument, the Court will discuss the difference between claim preclusion and issue preclusion.

Under Arizona law, the doctrines of claim preclusion—*res judicata*—and issue preclusion—collateral estoppel—"relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Hawkins*, 183 Ariz. at 103 (internal quotations omitted). Although they share similar purposes, the doctrines are nonetheless different. *Id.* As explained by the Arizona Court of Appeals:

> Under the doctrine of *res judicata* [or claim preclusion], a judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. This doctrine binds the same party standing in the same capacity in subsequent litigation on the same cause of action, not only upon facts actually litigated but also upon those points which might have been litigated . . . .

> The doctrine of "collateral estoppel" is a doctrine of issue preclusion. It bars a party from relitigating an issue identical to one he has previously litigated to a determination on the merits in another action.

*Id.* (quoting *Gilbert v. Bd. of Med. Exam'rs*, 155 Ariz. 169, 174 (App. 1987)).

In this case, Defendants do not argue that Dr. Sharifi's § 1981 claims are barred by *res judicata*. (Doc. 66 at 11; Doc. 68 at 2.) Nor are Defendants arguing that Dr. Sharifi is precluded from presenting evidence of racial discrimination in the present matter. (Doc. 66 at 10.) Rather, Defendants' position is that Dr. Sharifi is precluded from relitigating only the factual issues decided by the state court. (Doc. 66 at 11; Doc. 68 at 2.) The state court determined that "[o]n all three substantive grounds alleged as the basis for revocation of Dr. Sharifi's [PSAs]"—patient care issues, alteration of medical records, and disruptive behavior—"there is substantial evidence to support the decision of Banner Health." *Sharifi Takieh*, No. CV 2017-055848 at 6. Defendants' preclusion arguments pertain only to those findings. If Dr. Sharifi is barred from contesting the state court's findings in this action, Defendants argue Dr. Sharifi cannot plausibly allege that his race was the but-for cause of Banner's decision. (Doc. 66 at 11.)

Given the precision of Defendants' preclusion arguments, the question of whether Dr. Sharifi had a "full and fair opportunity to litigate whether racial discrimination was [a] 'but' for' cause" is rendered immaterial. Dr. Sharifi is not precluded from alleging facts that show racial discrimination was the but-for cause of Banner's decision. Thus, because the Ruling is entitled to preclusive effect, the Court must determine the consequence of issue preclusion.

### d.    Consequence of Issue Preclusion

The Court notes that this case presents an unusual scenario. The FAC itself contains independent, non-discriminatory reasons for Banner's decision. *See supra* Part III.A.1. Accordingly, the FAC fails to plausibly allege that Dr. Sharifi's race was the but-for cause of Banner's decision. *Astre*, 804 F. App'x at 667.

In addition to the race-neutral reasons alleged in the FAC, the state court has already

determined that substantial evidence supports Banner's decision to revoke Dr. Sharifi's PSAs on grounds of patient care concerns, alteration of medical records, and disruptive behavior. Ordinarily, this Court would not consider legitimate, nondiscriminatory reasons proffered by a defendant at the pleading stage. *See Astre*, 804 F. App'x at 667 n.3. Doing so would improperly invoke the *McDonnell Douglas* burden-shifting framework, which "is a summary judgment 'evidentiary standard, *not* a pleading requirement.'"[9] *Id.* (internal quotations omitted). In this case, however, by virtue of judicial notice and the doctrine of issue preclusion, the Court must consider how the factual issues resolved by the state court impact Dr. Sharifi's claims at the pleading stage.

Defendants argue the existence of the legitimate, non-discriminatory reasons for Banner's decision confirmed by the state court render Dr. Sharifi's § 1981 claims implausible. (Doc. 66 at 11.) Dr. Sharifi, on the other hand, contends the fact "there was evidence to support a non-discriminatory reason (or reasons)" for Banner's decision does not automatically foreclose his ability to plead but-for cause. (Doc. 61 at 7.)

Pre-*Comcast*, a plaintiff within the Ninth Circuit needed only to plead that racism was a motivating factor in a defendant's decisionmaking. *See Nat'l Ass'n of Afr. Am.-Owned Media*, 915 F.3d at 623–26. If racial animus played some role in a defendant's action, a § 1981 claim could be plausibly alleged. *Id.* Thus, under the former "motivating factor" standard, Dr. Sharifi's argument would prevail.

Now, however, § 1981's causation standard is more rigorous. *See Comcast Corp.*, 140 S. Ct. at 1019. That is, "a plaintiff must initially plead . . . that, but for race, it would not have suffered the loss of a legally protected right." *Id.* To state a claim that is plausible under the but-for causation standard, a complaint must contain sufficient factual matter to show that racial prejudice was a necessary condition of a contractual impairment. *See e.g.*,

---

[9] "[T]he *McDonnell Douglas* criteria provide a useful guide to a plaintiff's burden in a section 1981 . . . non-class employment discrimination suit." *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 538 (9th Cir. 1982) (internal quotations omitted). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997). If the plaintiff succeeds, the burden of production shifts to the defendant to "articulate a legitimate, nondiscriminatory reason" for its decision. *Id.* If the defendant does so, the plaintiff can prevail by demonstrating that the defendant's reason is pretextual. *Id.*

*Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–63 (7th Cir. 1990). But that does not mean that racial animus must be the *sole* reason for an alleged act. Thus, the Court finds that the fact a defendant has mixed motives—i.e., legitimate and illegitimate reasons for an alleged act—does not, in and of itself, render a § 1981 claim implausible.[10]

For example, if Banner would not have revoked a non-Arab physician's PSAs despite the patient care issues, the alteration of medical records, and disruptive behavior present in this case, then Dr. Sharifi's race could plausibly be the but-for cause of Banner's decision. But what is equally true is that if Banner would have revoked Dr. Sharifi's PSAs due to patient care concerns, his alteration of medical records, or disruptive behavior, even if Dr. Sharifi was non-Arab, then his race cannot be the but-for cause of Banner's decision. To be actionable, there must be harm from alleged racial prejudice. *Bachman*, 902 F.2d at 1263. If the harm would have occurred anyway, racial discrimination is not the but-for cause of an alleged act. *Id.* Considering those principles, a narrow pathway for Dr. Sharifi to plausibly allege a § 1981 claim exists.

### i. Disparate Treatment

Dr. Sharifi contends his race was the but-for cause of Banner's decision because "other similarly situated non-Arabic physicians would never have been subjected to an investigation." (FAC ¶ 401.) "'[I]ndividuals are similarly situated when they have similar jobs and display similar conduct,' including 'engag[ing] in problematic conduct of comparable seriousness.'" *Bastidas v. Good Samaritan Hosp. LP*, 774 F. App'x 361, 363 (9th Cir. 2019) (quoting *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)).

---

[10] Albeit in a different context, this finding is consistent with Ninth Circuit law pertaining to claims under the Age Discrimination in Employment Act ("ADEA"). Like § 1981 claims, claims arising under the ADEA require a plaintiff to establish but-for causation. *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012). The Ninth Circuit utilizes the *McDonnell Douglas* framework to decide motions for summary judgment in ADEA cases. *Id.* Inherent in that framework, is the possibility that a defendant may assert a legitimate, non-discriminatory reason for an alleged wrong. *See Cordova*, 124 F.3d at 1148. If that showing is made, a plaintiff can still prevail on his or her claim by showing the defendant's proffered reason is pretextual. *Id.* Accordingly, it would make little sense for the Court to bar a plaintiff from asserting a § 1981 at the pleading stage solely due to some non-discriminatory reason for a defendant's conduct that is extraneous to the complaint, when, at the summary judgment stage, the plaintiff could prevail on the claim by showing pretext.

Here, the FAC alleges five non-Arab physicians were treated more favorably than Dr. Sharifi. (FAC ¶¶ 417–26.) First, Dr. S. A., a physician at Banner Heart Hospital ("BHH"), allegedly "gave catheter directed thrombolysis to a patient," causing death, "incompetently labelled a large collateral as iliac vein . . . to place a venous stent," and "incompetently embolized a filter device." (*Id.* ¶¶ 419–21.) Second, Dr. J. D., a physician at BBMC, allegedly performed a procedure "on a patient with minimal symptoms and no guideline-directed indication for the procedure, and the patient died because [Dr. J. D.] failed to place a filter device." (*Id.* ¶ 422). Third, Dr. J. G., a physician at BHH, is alleged to have performed multiple procedures in a patient who was not an appropriate candidate for the interventions. (*Id.* ¶ 423.) That patient required surgery. (*Id.*) During surgery, "Dr. J. G. perforated [a] vessel and the patient died." (*Id.*) Fourth, the FAC alleges that Dr. L. A., a physician who appears to be affiliated with both BHH and BBMC, "extensively changed [a] preliminary consult report before it was signed and turned into a final report." (*Id.* ¶ 424.) Last, the FAC asserts that Dr. A. A., a physician at BHH, caused the death of a patient while performing a procedure.[11] (*Id.* ¶ 425.) The FAC alleges that none of the identified physicians were reported to the Arizona Medical Board or National Practitioner's Database following their alleged wrongdoings. (*Id.* ¶¶ 419–25.)

These allegations do not plausibly suggest that Dr. Sharifi's race was the but-for cause of Banner's decision. First, Dr. Sharifi's § 1981 claims are not premised on him being reported to the Arizona Medical Board or the National Practitioner's Database. Rather, Dr. Sharifi's claims arise from Banner's peer review process and the revocation of his PSAs. (*Id.* ¶ 472.) The FAC provides no information regarding whether the identified physicians were subject to peer review or whether their PSAs with Banner were suspended or revoked. Second, not one of the identified physicians is alleged to have presented all three concerns that support Banner's decision to revoke Dr. Sharifi's PSAs. Third, although

---

[11] The FAC also alleges that "Defendants' disparate treatment of individuals of non-Arabic descent is also evidenced by its hostile treatment and discrimination towards other physicians of Arabic descent." (FAC ¶ 426.) "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their *own* contractual relationship, not of someone else's." *Domino's Pizza*, 546 U.S. at 480.

Dr. Sharifi baldly asserts he and the identified physicians "are similarly situated in all relevant respects," he has made no attempt to explain what those "relevant respects" are or how the facts alleged in the FAC establish that similarity. (Doc. 59 at 6.) Last, Dr. Sharifi offers no legal authority, binding or otherwise, to support his argument that "any determination which [] refer[s] to a similarly situated comparator [is] better made after discovery." (*Id.*) *See Comcast Corp.*, 140 S. Ct. at 1014–15, 1019 (rejecting the invitation to impose a lesser causation burden at the pleading stage). Accordingly, Dr. Sharifi's factual allegations as to similarly situated physicians do not plausibly suggest that Dr. Sharifi's race was the but-for cause of Banner's decision.

## ii.   Discriminatory Statements

Dr. Sharifi's causation allegations are also based, in part, on multiple statements allegedly made by some of the individual Defendants. (FAC ¶¶ 398–99, 407.) If there is some nexus between an alleged racial slur and an adverse decision, the discriminatory remark is direct evidence of discriminatory intent. *DeHorney v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 879 F.2d 459, 468 (9th Cir. 1989). Discriminatory intent and but-for causation, however, are separate elements of a § 1981 claim. *See Astre*, 804 F. App'x at 666–67. Thus, the fact a defendant had discriminatory intent does not necessarily imply that racial animus was the but-for cause of the defendant's action.

Assuming without deciding that § 1981 forbids discrimination based on Dr. Sharifi's Iranian heritage, the Court finds that the alleged discriminatory remarks do not plausibly suggest Dr. Sharifi's race was the but-for cause Banner's decision.[12] The Defendants alleged to have made discriminatory remarks include: Ms. Dinner, Dr. O'Connor, Dr. O'Meara, and Dr. Maxfield. As discussed, the FAC alleges that those

---

[12] Section 1981 prohibits only racial discrimination, which is broadly defined to include discrimination "because of [] ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Discrimination solely based on religion or national origin is not actionable under the statute. *Id.*; *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999). The Court notes that the FAC describes Dr. Sharifi as "an Iranian immigrant of Arabic descent" and explains "[t]he portion of his name 'Seyed' indicates that he is from an Arabic tribe that settled in the territory now known as Iran, which is where he was born." (FAC ¶¶ 32–33.) Thus, the FAC appears to delineate between Dr. Sharifi's Arab ancestry and his Iranian national origin.

Defendants were motivated by previous, personal interactions with Dr. Sharifi. *See supra* Part III.A.1. Thus, to the extent Dr. O'Connor, Dr. O'Meara, Dr. Maxfield, or Ms. Dinner acted with racial animus, Dr. Sharifi has not plausibly alleged that his race was the but-for cause of Defendants' actions or Banner's decision to revoke his PSAs.

The FAC further alleges that Mr. Fine "has been overheard stating that individuals of Dr. Sharifi's race do not fit in the Banner culture and must be pushed out." (FAC ¶ 397.) Dr. Sharifi provides no additional detail as to what those alleged statements were, when they were made, or whom overhead them. The allegation is therefore too speculative to be regarded as plausible. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

The FAC also asserts "[t]he directive to eliminate physicians of Dr. Sharifi's race, and even Dr. Sharifi, came from Banner management and specifically from Defendants Fine and Volk." (FAC ¶ 398.) The exhibit Dr. Sharifi cites to support that assertion, however, offers no facts that would support an inference of discriminatory intent on behalf of Mr. Fine or Mr. Volk. (*See* Atencio Decl.)

Accordingly, the Court finds that the factual allegations pertaining to discriminatory remarks do not plausibly suggest that Dr. Sharifi's race was the but-for cause of Banner's decision or any Defendants' actions.

### iii.    Race-Neutral Explanations

At this stage, the Court is not permitted to weigh evidence or determine whether the explanations offered by Dr. Sharifi or Defendants are ultimately more persuasive. *See Nat'l Ass'n of Afr. Am.-Owned Media*, 915 F.3d at 627. Instead, the Ninth Circuit has explained that "[i]f there are two alternative explanations, one advanced by [a] defendant and the other advanced by [a] plaintiff, both of which are plausible, [the] plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). But, if a "defendant's plausible alternative explanation is so convincing that [the] plaintiff's explanation is *im*plausible," the plaintiff's complaint may be dismissed. *Id.*

In this case, the factual allegations in the FAC do not "plausibly suggest an

entitlement to relief" because they do not support an inference that Dr. Sharifi's race is the but-for cause of Banner's decision. *Starr*, 652 F.3d at 1216. Dr. Sharifi thereby fails to provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence to support the allegations." *Id.* at 1217 (internal quotations omitted). Instead, Defendants' competing explanation—that the revocation of Dr. Sharifi's PSAs was due to a concern for patient safety, Dr. Sharifi's alteration of medical records, and his disruptive behavior—is not only plausible but "so convincing" that the Court finds Dr. Sharifi's allegations are rendered implausible. *Id.* at 1216. Thus, the Court will dismiss the FAC against all Defendants.

## B.    Individual Liability

In addition, Dr. Lyons, Dr. Hu, Dr. Maxfield, Dr. O'Connor, Mr. Fine, Mr. Volk, and Ms. Dinner contend that the FAC fails to allege a plausible § 1981 claim against each of them individually. (Doc. 54 at 3–9; Doc. 55 at 7–9.) At oral argument, Dr. Sharifi argued that Banner's "environment" is enough to confer personal liability on the individual Defendants. Dr. Sharifi's argument is at odds with applicable law.

"A claim for individual liability under § 1981 requires some affirmative link to causally connect the actor with the discriminatory action." *Elmatboly v. Ariz. State Univ. (ASU)*, No. 2:05-CV-3518-HRH, 2009 WL 10674070, at *6 (D. Ariz. Apr. 30, 2009) (internal quotations omitted). A claim alleging individual liability under § 1981 must therefore "be predicated on the actor's personal involvement" in the adverse decision. *Id.*

The FAC contains few factual allegations pertaining to Dr. Lyons. The FAC alleges Dr. Lyons participated in a conversation with Dr. Hu and Dr. Maxfield. (FAC ¶¶ 30, 83, 373.) During that conversation, Dr. Maxfield allegedly encouraged Dr. Hu to "F… this F…ing Iranian," referring to Dr. Sharifi. (*Id.*) If Dr. Maxfield's statement constitutes circumstantial evidence of discriminatory intent, the allegation is insufficient to establish a plausible § 1981 claim against Dr. Lyons. *Patterson v. Apple Comput., Inc.*, 256 F. App'x 165, 168 (9th Cir. 2007) (finding stray comments having nothing to do with workplace decisionmaking insufficient to establish discrimination); *see also Merrick v. Farmers Ins.*

*Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990) ("'[S]tray' remarks are insufficient to establish discrimination."). Indeed, the FAC is devoid of factual allegations showing that Dr. Lyons was a member of any decision-making body with the power to revoke Dr. Sharifi's PSAs. *See DeHorney*, 879 F.2d at 468 (requiring a nexus between a defendant's actions and the adverse decision). Moreover, because the FAC suggests that professional jealousy and competition motivated Dr. Lyons, Dr. Sharifi fails to plausibly allege that Dr. Lyons impaired Dr. Sharifi's contractual relationship with Banner because of Dr. Sharifi's race. (FAC ¶¶ 135, 143.) *See Astre*, 804 F. App'x at 667. Thus, Dr. Sharifi fails to state § 1981 claim against Dr. Lyons.

The § 1981 claim against Dr. Hu fails for similar reasons. Dr. Hu is alleged to have (1) testified falsely against Dr. Sharifi, (2) conversed with Dr. Maxfield and Dr. Lyons, and (3) intimated witnesses attempting to testify in support of Dr. Sharifi. (FAC ¶¶ 30, 81–83, 333–37, 373–77.) But like the allegations, or lack thereof, as to Dr. Lyons, the FAC is devoid of facts that could support an inference of discrimination on Dr. Hu's behalf. The FAC contains no factual allegations showing that Dr. Hu was a decisionmaker with authority to revoke Dr. Sharifi's PSAs. And, because the FAC alleges that competition motivated Dr. Hu, the FAC does not plausibly allege that Dr. Hu impaired Dr. Sharifi's contractual relationship with Banner because of Dr. Sharifi's race. (*Id.* ¶¶ 135, 143.)

As to Dr. Maxfield, the FAC alleges that he "had been trying to get rid of Dr. Sharifi since 2009" and referred to Dr. Sharifi as a "F…ing Iranian" in 2017. (*Id.* ¶¶ 30–31, 83.) To the extent Dr. Maxfield subjecting Dr. Sharifi to peer review in 2009 was racially motivated, the alleged acts are too far removed from Banner's decision to revoke Dr. Sharifi's PSAs to be actionable. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting "temporal proximity must be 'very close'" to constitute evidence of causality). Dr. Maxfield is not alleged to have been a member of any decision-making body involved in the revocation of Dr. Sharifi's PSAs. And, like Dr. Lyons and Dr. Hu, the FAC alleges that Dr. Maxfield was motivated by competition, not because of Dr. Sharifi's race. (FAC ¶¶ 135, 143.) The § 1981 claim against Dr. Maxfield therefore fails.

1    Dr. Sharifi's § 1981 claim against Dr. O'Connor is also implausible. Dr. O'Connor

2    is alleged to have initiated the MEC's peer review process because Dr. Sharifi reported him

3    to Banner's Chief Clinical Officer. (*Id.* ¶¶ 273, 354, 366–67.) The FAC alleges that

4    Dr. O'Connor misled and manipulated MEC members and testified against Dr. Sharifi at

5    the Fair Hearing. (*Id.* ¶¶ 360, 445.) The FAC further alleges that, in 2015, Dr. O'Connor

6    stated that Dr. Sharifi is "a Muslim Iranian terrorist who kills patients with his venous

7    procedures and must be punished first and then removed from Banner. He testified against

8    Banner in a case at Gateway." (Atencio Decl. at 1.) As noted, the reasonable inference to

9    be drawn from these factual allegations is that Dr. O'Connor was motivated, in part,

10   because Dr. Sharifi testified against Banner and reported him to Banner's Chief Clinical

11   Officer. The FAC therefore does not plausibly allege Dr. O'Connor impaired Dr. Sharifi's

12   contractual relationship with Banner because of is race. In addition, Dr. O'Connor is not

13   alleged to have been a member of any decision-making body with authority to revoke

14   Dr. Sharifi's PSAs. (FAC ¶¶ 273, 366.) *See Vasquez*, 349 F.3d at 638, 640–61 (finding

15   evidence of discriminatory statements made by a plaintiff's superior insufficient to

16   establish a prima facie case because the superior was not a decisionmaker). Thus,

17   Dr. Sharifi fails to state a § 1981 claim against Dr. O'Connor.

18   The § 1981 claim against Ms. Dinner is also implausible for the following reasons.

19   The FAC is littered with allegations concerning Ms. Dinner's alleged involvement in

20   Banner's decision to revoke Dr. Sharifi's PSAs. (FAC ¶¶ 28, 69–71, 80, 83, 85, 165, 171–

21   72, 179, 189, 196, 203–06, 249–50, 301–04, 349–50, 360, 375–77, 379, 382, 384–86, 406–

22   09, 413–15, 452.) But the FAC expressly alleges Ms. Dinner had race-neutral motives for

23   her actions—that is, Dr. Sharifi previously sued her and reported her to the State Bar. (*Id.*

24   ¶ 386; Wilson Decl. ¶ 15.) Thus, the FAC does not plausibly allege that Dr. Sharifi's race

25   was the but-for cause of Ms. Dinner's actions.

26   The factual allegations pertaining to Mr. Fine and Mr. Volk are discussed in

27   Part III.A.2.d.ii. Although Mr. Fine and Mr. Volk are alleged to have had decision-making

28   authority, the factual allegations suggesting that Mr. Volk or Mr. Fine possessed racial

1   animus are not supported by well-pleaded factual allegations. Instead, it appears from the

2   FAC, that Mr. Fine's impetus, if any, for wanting "to get rid of Dr. Sharifi" is Dr. Sharifi's

3   testimony against Banner, not his race. (FAC ¶ 399; Wilson Decl. ¶ 19.) Thus, the § 1981

4   claims against Mr. Fine and Mr. Volk fail.

5       **C.      Leave to Amend**

6       Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend

7   should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "The power to

8   grant leave to amend . . . is entrusted to the discretion of the district court, which determines

9   the propriety of a motion to amend by ascertaining the presence of any of four factors: bad

10  faith, undue delay, prejudice to the opposing party, and/or futility." *Serra v. Lappin*, 600

11  F.3d 1191, 1200 (9th Cir. 2010) (internal quotations omitted). "Generally, this

12  determination should be performed with all inferences in favor of granting" leave to amend.

13  *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999). District courts properly

14  deny leave to amend if the proposed amendment would be futile. *Saul v. United States*, 928

15  F.2d 829, 843 (9th Cir. 1991). "[A] proposed amendment is futile only if no set of facts

16  can be proved under the amendment to the pleadings that would constitute a valid and

17  sufficient claim." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

18      The distinction between the two sets of race-neutral reasons present in this case—

19  i.e., those alleged in the FAC and those affirmed in the state court Ruling—is critical to the

20  Court's analysis. If this Court affords Dr. Sharifi leave to amend, he could possibly scrub

21  the FAC of the alleged race-neutral reasons for Defendants' acts. By doing so, Dr. Sharifi

22  would cure, at least some, of the FAC's defects and brush under the rug, for now, some of

23  his claims' shortcomings. But, regardless of any amendment, Dr. Sharifi will continue to

24  be precluded from contesting that substantial evidence supports Banner's decision on

25  grounds of patient care concerns, alterations of medical records, and disruptive behavior.

26      The Court, in this Order, found Defendants' explanation—that the impairment to

27  Dr. Sharifi's PSAs was due to a concern for patient safety, his alteration of medical records,

28  and disruptive behavior—so convincing that Dr. Sharifi's allegations are rendered

implausible. *See supra* Part III.A.2.d.iii. This is particularly true given that a state court affirmed Banner's proffered explanation. Because no amendment to the FAC will overcome the Court's finding as to Defendants' explanation, amending the FAC would be futile. *See Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (noting a district court may deny leave to amend if a "pleading could not possibly be cured by the allegation of other facts"). Accordingly, Dr. Sharifi's § 1981 claims are dismissed with prejudice.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED granting** Defendants' Motions to Dismiss (Docs. 53–55).

**IT IS FURTHER ORDERED dismissing** this case with prejudice.

**IT IS FINALLY ORDERED directing** the Clerk of the Court to enter judgment accordingly and close this case.

Dated this 27th day of January, 2021.

Michael T. Liburdi
United States District Judge